172                                    437 Mass. 172 (2002)

New England Division of the American Cancer Society *v.* Commissioner of Administration.

New England Division of the American Cancer Society
& others[1] *vs.* Commissioner of Administration & others.[2]

Suffolk. May 9, 2002. - June 14, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Governor. Commonwealth,* Financial matters. *Constitutional Law,* Standing,
Separation of powers, Delegation of powers, Appropriation of money.
*Practice, Civil,* Standing. *Statute,* Construction.

Plaintiff organizations that sponsored, supported, or administered tobacco
control programs and other cancer-related health initiatives that, as a direct
result of G. L. c. 29, § 9C, allotment reductions, had not received promised
funding and had been forced to scale back, or eliminate, their programs,
and that were able to establish not only harm that was fairly traceable to
the challenged allotment reductions, but also a likely benefit should fund-
ing be restored, established standing to bring the present action. [176-178]
The Governor's authority under G. L. c. 29, § 9C, to reduce allotments for
certain appropriated expenditures in the Commonwealth's budget applied
only in circumstances when the total available revenues during a fiscal
year would be insufficient to meet all of the Commonwealth's expenditures,
and because § 9C allowed the Governor, on notification of such a projected
deficiency, to reduce allotments under G. L. c. 29, § 9B, and contained no
restriction as to which allotments, the specific reductions challenged by
plaintiff organizations that sponsored, supported, or administered programs
that were being affected by the reductions were permissible under § 9C.
[178-182]
General Laws c. 29, § 9C, authorizing the Governor to reduce allotments for
certain appropriated expenditures in the Commonwealth's budget, did not
constitute an unlawful delegation of the Legislature's authority to appropri-
ate funds in violation of the separation of powers principles expressed in
art. 30 of the Declaration of Rights to the Massachusetts Constitution.
[182-185]

[1]Massachusetts Association of Health Boards, Massachusetts Prevention
Center-MetroWest/West, Franklin Regional Council of Governments, Athol
Memorial Hospital, Barnstable County Department of Health and the Environ-
ment, Malden YWCA, Spanish American Union, Laurel Pelis, Charron Daugh-
try, and Joann Stone.

[2]The acting Commissioner of Administration (during the time relevant to
the proceedings), the comptroller, and the Commissioner of Public Health. We
agree with the defendants that the comptroller does not belong as a party to
this case. His function in certifying payments is entirely ministerial and he has
not acted, or refused to act, with respect to the present controversy.

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on February 27, 2002.

The case was reported by *Sosman*, J.

*John T. Montgomery* (*Lisa M. Ropple & John P. Bueker* with him) for the plaintiffs.

*John D. Hanify*, Special Assistant Attorney General (*David C. Kravitz* with him) for the defendants.

*Pierce O. Cray*, Assistant Attorney General, for the intervener.

*Pamela P. Heacock & Paul W. Johnson*, for American Heart Association & others, amici curiae, submitted a brief.

GREANEY, J. The plaintiffs commenced this action in the Supreme Judicial Court for the county of Suffolk pursuant to G. L. c. 214, § 1, challenging actions taken by the defendant State officials and by the Acting Governor[3] (Governor), pursuant to G. L. c. 29, § 9C, to reduce allotments for certain expenditures appropriated in the fiscal year 2002 budget for smoking prevention and for cancer and multiple sclerosis detection and treatment initiatives. See St. 2001, c. 177, § 2, line items 4590-0300, 4590-0250, 4513-1115, 4513-1112, 4000-0875. The plaintiffs seek a declaratory judgment stating that the reductions were an improper exercise of the Governor's authority under G. L. c. 29, § 9C, or, in the alternative, that G. L. c. 29, § 9C, constitutes an unconstitutional delegation of legislative authority in violation of the separation of powers principles expressed in art. 30 of the Declaration of Rights to the Massachusetts Constitution.[4] A single justice reserved and reported this case to the full court on a statement of agreed facts.[5] We conclude that the challenged reductions are authorized under

[3]The plaintiffs properly did not name the Acting Governor as a defendant. See *Milton* v. *Commonwealth*, 416 Mass. 471, 475 (1993), and cases cited.

[4]The plaintiffs also seek an injunction requiring the defendants "to take all reasonable and necessary steps to fulfill the obligation to disburse the funds appropriated by" the five line items at issue. In view of our conclusion that the challenged actions were lawful, we need not reach the issue of the propriety of injunctive relief.

[5]Pursuant to his authority under G. L. c. 12, § 3, the Attorney General appointed a special assistant attorney general to represent the defendants on all claims brought by the plaintiffs. The single justice subsequently allowed the Attorney General's motion to intervene pursuant to G. L. c. 231A, § 8. The American Heart Association, the Massachusetts Medical Society, the Mas-

G. L. c. 29, § 9C, and are constitutional.

On November 21, 2001, the Legislature enacted its fiscal year 2002 general appropriations act. St. 2001, c. 177. The State subsequently experienced a decline in revenues, well beyond expectations, and, on February 5, 2002, the acting Commissioner of Administration (commissioner) informed the Governor that available revenues for fiscal year 2002 would be insufficient to meet authorized expenditures. The projected shortfall was $289 million. Relying on information and recommendations of the fiscal affairs division,[6] the commissioner proposed specific cuts in allotments for specified line-item accounts in the budget, to be made pursuant to the Governor's authority under G. L. c. 29, § 9C, amounting to a total expenditure reduction of $155 million.[7]

General Laws c. 29, § 9C, provides that:

> "Whenever, in the opinion of the commissioner of administration, available revenues as determined by him from time to time during any fiscal year under the provisions of [§ 5B[8]] will be insufficient to meet all of the expenditures authorized to be made from any fund, whether by appropriation or distribution, he shall immediately notify the governor and the house and senate committees on ways and means of the amount of such probable deficiency of revenue and the governor, within fifteen days of such notification, shall reduce allotments

sachusetts Senior Action Council, and the Massachusetts Public Health Association together filed an amicus brief.

[6]According to the parties' statement of agreed facts, the fiscal affairs division based its recommendations, at least in part, on information provided by the agencies respecting which accounts might be reduced and by what amounts.

[7]The commissioner also recommended introducing legislation "to reduce the Fiscal Year 2002 contribution to the Commonwealth's unfunded pension liability by $134 million."

[8]Section 5B requires the Commissioner of Administration (commissioner), on a triannual basis, to "prepare and submit to the governor, to the house and senate committees on ways and means, and to the joint committee on taxation revised estimates of revenue available to meet appropriations and other needs in the current fiscal year . . . accompan[ied by] explanations of any changes . . . for specific sources of revenue."

437 Mass. 172 (2002) · 175

New England Division of the American Cancer Society *v.* Commissioner of Administration.

under [§ 9B[9]] or he shall submit to the general court specific proposals to raise additional revenues by a total amount equal to such deficiency.

"As an alternative to the submission of such proposals to raise additional revenues and to the extent funds are available, the governor may recommend an appropriation equal to such deficiency from the Commonwealth Stabilization Fund in the manner provided in [§ 2H[10]]."

The Governor responded to the projected budget deficit by directing the commissioner to implement the recommended al-

---

[9]Section 9B requires the Governor to divide annual appropriations made to State agencies into periodic allotments which represent the total amount of money that the agency may spend during that period. "In this way, it is generally expected that an appropriation will be expended proportionately over the course of a fiscal year." *Brookline* v. *The Governor*, 407 Mass. 377, 381 (1990). Section 9B reads, in pertinent part, as follows:

"Any monies made available by appropriation or otherwise, to state agencies under the control of the governor or a secretary, but not including the courts, the office of the governor, or the office of the lieutenant governor, shall be expended only in such amounts as may be allotted as provided in this section. The governor shall from time to time divide each fiscal year into allotment periods of not less than one month nor more than four months. The governor or the commissioner when designated in writing by the governor shall allot to each such state agency the amount which it may expend for such period out of the sums made available to it by appropriation or otherwise. The amount so allotted initially by the governor or the commissioner shall be equal to an amount calculated in accordance with the following formula: the annual sum available for expenditure divided by twelve multiplied by the number of months in the allotment period, unless the full legislative objective of an appropriation would be accomplished, without amendment, by a lesser allocation than that required by the formula."

[10]Section 2H establishes the Commonwealth Stabilization Fund, as a reserve to be used:

"(1) to make up any difference between actual state revenues and allowable state revenues in any fiscal year in which actual revenues fall below the allowable amount and (2) to replace the state and local loss of federal funds or (3) for any event which threatens the health, safety or welfare of the people or the fiscal stability of the commonwealth or any of its political subdivisions. Such event or events, as determined by the general court, shall include . . . a substantial decline in economic indicators which result in severe reductions in state revenues or state financial assistance to local governmental units, or court ordered or

lotment reductions. These reductions affected, among other expenditures, monies that had been appropriated by the Legislature for local health programs dedicated to smoking prevention and cessation, multiple sclerosis services, prostate cancer prevention, and cervical and breast cancer treatment. See St. 2001, c. 177, § 2. The plaintiffs challenge, specifically, allotment reductions made by the Governor for expenditures for the following line items: (1) line item 4590-0300: smoking prevention and cessation ($50,342,217 appropriated, $5,962,870 reduction); (2) line item 4590-0250: smoking prevention expansion ($37,867,379 appropriated, $10,642,410 reduction); (3) line item 4513-1115: multiple sclerosis programs ($438,700 appropriated, $340,000 reduction); (4) line item 4513-1112: prostate cancer prevention ($3,500,000 appropriated, $2,603,444 reduction); and (5) line item 4000-0875: cervical and breast cancer expansion ($2,824,522 appropriated, $2,824,552 reduction).

1. We consider first the defendants' claim that the plaintiffs lack standing to bring this action. Eight of the plaintiffs are organizations that sponsor, support, or administer tobacco control programs and other cancer-related health initiatives. Several had extended contracts with the Department of Public Health to receive funding for these programs in fiscal year 2002. The record indicates that, as a direct result of the § 9C allotment reductions, they have not received promised funding and have been forced to scale back, or eliminate, their programs.[11] Two plaintiffs, the New England Division of the American Cancer Society and the Massachusetts Association of Health Boards, have member organizations that have been

otherwise mandated assumptions by the commonwealth of programs or costs of programs previously borne by local governmental units."

[11]Specifically, the Massachusetts Prevention Center-Metro West/West (which had entered a contract to receive $136,602 in funding for smoking prevention purposes, and $4,820 for education materials on the risks of, and need for periodic screening for, prostate cancer); the Tobacco-Free Greater Franklin County Coalition and the Tobacco Treatment Outreach Program, both within the Franklin Regional Council of Governments (which had entered a contract to receive $120,000 and $60,000, respectively); the Tobacco Outreach & Referral Program at Athol Memorial Hospital (which had entered a contract to receive $30,000 in funding); and the Tobacco Outreach & Referral Program at

437 Mass. 172 (2002)     177

New England Division of the American Cancer Society v. Commissioner of Administration.

similarly affected. See *Animal Legal Defense Fund, Inc.* v. *Fisheries & Wildlife Bd.*, 416 Mass. 635, 638 n.4 (1993) (recognizing associational standing when members would have standing in own right).[12]

Each of the plaintiff organizations has been "directly and specially" affected by the Governor's action. *Brookline* v. *The Governor*, 407 Mass. 377, 384 n.10 (1990). Moreover, because the underlying contracts are (presumably) still in existence, we can infer that, should the monies represented by the § 9C allotment reductions at issue be forthcoming, the promised funding to the plaintiff organizations would be restored.[13] The plaintiffs thus have established not only harm that is fairly traceable to the challenged allotment reductions, but a likely benefit should the contested point be resolved in their favor. That is enough to confer standing in these circumstances. See *Mitchell* v. *Secretary of Admin.*, 413 Mass. 330, 333 n.7 (1992) (organizations that stand to benefit from increased expenditures have standing to challenge improper transfer from Highway Fund); *Barnes* v. *Secretary of Admin.*, 411 Mass. 822, 824-825 (1992) (allowing

the Malden YWCA (which had entered a contract to receive $30,000 in funding) were forced to close. In addition, the Barnstable County department of health and the environment (which had entered a contract to receive $260,100 in funding for smoking prevention) was forced dramatically to scale back its Cape Cod Regional Tobacco Control Program, and the Spanish American Union (which was to receive $470,736 in funding) had to discontinue its tobacco outreach and education program and reduce services provided by its men's health initiative.

[12]The remaining three plaintiffs are individuals who provided, or received, services under a program within the department of public health providing intensive case management and care coordination services for individuals living with multiple sclerosis (MS Pass program). As a result of the § 9C allotment reductions, the MS Pass program was eliminated. Consequently, one plaintiff lost her job, and two have failed to receive promised reimbursement for expenses relating to their condition. Because we conclude that the organizational plaintiffs have standing in these circumstances, we need not consider whether the same holds true for the individual plaintiffs. See *Massachusetts Teachers Ass'n* v. *Secretary of the Commonwealth*, 384 Mass. 209, 214 (1981); *Save the Bay, Inc.* v. *Department of Pub. Utils.*, 366 Mass. 667, 674-675 (1975).

[13]All State agency contracts of this kind must contain a clause allowing the agency to terminate the contract in the event that funding becomes unavailable. There is nothing in the record, however, to indicate that the contracts in question have been terminated.

organizations committed to assisting homeless to challenge refusal to release funds appropriated by the Legislature). Cf. *Alliance, AFSCME/SEIU, AFL-CIO* v. *The Governor*, 427 Mass. 546, 549-550 (1998) (plaintiff unions lacked standing to bring action for mandamus, where no showing that members would be hired, should challenged veto be declared invalid).

2. The plaintiffs maintain that the Governor's allotment reductions were improper uses of her statutory authority under G. L. c. 29, § 9C. Their claim is premised on the language of the statute, which directs the commissioner to notify the Governor when "available revenues . . . will be insufficient to meet all of the expenditures authorized to be made from any fund." The plaintiffs argue that "any fund" means "any [one] fund," and the Governor's authority under § 9C thus extends only to "reduc[ing] allotments" which are derived from that particular fund. Because the challenged allotment reductions were derived from three funds — the Health Protection Fund, see G. L. c. 29, § 2GG, the Tobacco Settlement Fund, see G. L. c. 29, 2XX, and the General Fund, see G. L. c. 29, § 2 — that were neither in deficit at the time of the reductions, nor projected to be in deficit by the end of the fiscal year, the plaintiffs assert that the Governor's authority under § 9C to reduce those allotments was not triggered. Accordingly, the plaintiffs urge this court to restore funding for the various health-related initiatives and programs represented by the line items in question.

The defendants respond that the Governor's authority under § 9C is triggered not whenever a deficit is projected for any particular fund, but solely when an over-all budget shortfall is projected for the fiscal year.[14] Once triggered, however, the statute permits selective reductions of allocations for expenditures from all funds made available to State agencies, to the extent of the projected over-all budget deficit. In support of their position, the defendants argue that common usage dictates that the words "any fund" be read to mean "every fund." According to the defendants, this interpretation allows § 9C to work in harmony with related statutes and to reflect the practical reality of how State finances operate. Thus, in the defendants'

---

[14]We take note of the fact that the Attorney General neither joins, nor opposes, the administration's position on this issue.

view, the Governor was authorized, under § 9C, to make "difficult spending reductions" in the fiscal year 2002 budget, including those for the challenged line items, to compensate for the projected budget shortfall of $289 million. We are persuaded that this position is the better reasoned of the two.

Aside from the ambiguous reference to "any fund," the language of the statute is specific and direct: the commissioner "shall immediately notify the governor and the house and senate committees on ways and means" of a probable deficiency and, within fifteen days of such notification, the Governor must take one of three actions. She may either (1) "reduce allotments under [§ 9B]"; (2) "submit to the general court specific proposals to raise additional revenues"; or (3) "recommend an appropriation . . . from the Commonwealth Stabilization Fund."[15]

The above mandates are set in motion whenever "available revenues as determined by [the commissioner] . . . under the provisions of [§ 5B]" are projected to be insufficient to meet "all of the expenditures to be made from any fund." Section 5B, in turn, speaks of "total available revenues." The statute does not require the commissioner to determine available revenue on a fund-by-fund basis.[16] See note 8, *supra.* Further, the number of available sources for revenue is far smaller than the over one hundred funds in existence. Although revised estimates of total available revenues under § 5B would indicate whether sufficient revenues were forthcoming to meet the authorized expenditures to be made from all funds, they simply would not generate a workable comparison with authorized expenditures to be made from any one fund.

Reporting requirements found elsewhere in the statutory scheme also appear to speak unambiguously of a single deficiency to be reported under § 9C. See G. L. c. 29, §§ 9D & 9E. When "any officer" anticipates that Federal, or other,

---

[15]The Commonwealth Stabilization Fund, see note 10, *supra*, is funded from a portion of the consolidated net surplus in State funds at the close of the fiscal year. See G. L. c. 29, §§ 2H & 5C. The fund's purpose is "to create and maintain a reserve" available in the event of fiscal emergencies. *Opinion of the Justices*, 430 Mass. 1201, 1202 (1999).

[16]The record shows, however, that, in his past two § 5B reports, the commissioner has included a breakdown of at least three major funds (the General Fund, the Highway Fund, and the Local Aid Fund).

funding will be less than previously estimated, § 9D directs the commissioner to "include such decrease in the deficiency, if any, reported under [§ 9C]." Similarly, when it appears to "any officer having charge of any office, department or undertaking that any appropriation therefor will be insufficient to meet all of the expenditures required in the current fiscal year by any provision of law, rule, regulation or order not subject to his control," § 9E directs that such amount be added, by the commissioner, to "any deficiency reported under [§ 9C]." The Legislature could only have intended that these statutes, enacted together in 1976 (St. 1976, c. 283, § 3F), work together as a "harmonious whole," consistent with the settled axiom that "where two or more statutes relate to the same subject matter, they should be construed together so as to constitute a harmonious whole consistent with the legislative purpose." *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 513-514 (1975).

Our conclusion is also supported by general principles under which our State finance system operates. The Commonwealth accounts for its finances through a system of "funds."[17] In addition to three major funds (the General Fund, the Local Aid Fund, and the Highway Fund), there are over one hundred minor funds that have been established by statutes, which generally specify a particular revenue source that is to be credited to the fund and particular objectives for which the credited revenues may be used.[18] At the end of each fiscal year, the comptroller certifies how all types of funds were used and provides a report

---

[17]A "[f]und" is defined as "an accounting entity established by general or special law to record all the financial resources or revenues together with all related expenditures or liabilities that are segregated for a particular purpose." G. L. c. 29, § 1.

[18]For example, G. L. c. 64C, § 7C, provides that revenues collected on cigarettes are to be credited to the Health Protection Fund, G. L. c. 29, § 2GG, and expended, subject to appropriation, primarily on education, advertising, and various programs devoted to smoking prevention and cessation. In a likewise manner, G. L. c. 29, § 2XX, provides that certain revenues are to be credited to the Tobacco Settlement Fund and expended, subject to appropriation, for the purpose of funding health-related services and programs. Although the plaintiffs characterize the challenged reductions as "especially egregious . . . in the case of the Health Protection Fund and the Tobacco Settlement Fund," they state in their brief that "the meaning of [§ ] 9C does not vary by the particular 'fund' involved."

that, for accounting purposes, associates monies appropriated and expenditures made from each fund. See G. L. c. 7A, § 12.

As a matter of cash management and flow, however, the Commonwealth maintains its cash resources in pooled accounts entirely disassociated with any particular fund. See G. L. c. 29, § 23. This system assumes that sufficient funds will exist in the State treasury to cover each allotment made by the Governor pursuant to § 9B. From an accounting standpoint, some funds are routinely in a deficit condition; other funds may vary from having positive to negative balances throughout the year.[19] Still other funds may begin the fiscal year with a negative balance, but the Legislature continues to designate line items in the budget to be further funded from them. So long as the total revenues are adequate to meet expenditures expected to be charged to every fund, a deficiency in any particular fund does not present a fiscal shortfall or crisis situation.[20] As stated by the commissioner in her affidavit, "[t]he [S]tate's overall fiscal health is judged on the net balance of all its funds, not on the balance of any one fund."

If the plaintiffs' interpretation of § 9C is correct, a projected deficit in any fund, even the most minor, could require the Governor's immediate response, in the form of acting to reduce allotments under § 9B; submitting to the Legislature proposals to raise taxes; or recommending to the Legislature an appropriation from the Commonwealth Stabilization Fund equal to the deficiency. The Legislature could not have intended the occurrence of what is, apparently, an ordinary event from an account-

---

[19]The Legislature does have the option of requiring that certain funds may not run deficits. See, e.g., G. L. c. 29, § 2BBB (Supp. 2001) (providing that the One-Time Capital Projects Improvement Fund "shall at no time during the fiscal year have a negative fund balance"); St. 2001, c. 177, § 2B (providing that "no expenditures shall be made from [the Intragovernmental Service Fund, G. L. c. 29, § 2Q] which would cause said fund to be in deficit at the close of fiscal year 2002"). Or, the Legislature may create trust funds for a dedicated purpose and not subject to appropriation. See G. L. c. 29, § 1.

[20]This is not to say that a deficit in a fund has no legal significance. The comptroller is responsible for ensuring that budgetary control is maintained on an individual appropriation account basis. See G. L. c. 7A, § 12; G. L. c. 29, § 5C. To resolve deficits reported in budgeted funds, he may recommend that the Legislature authorize the transfer of monies from other budgeted funds with surplus balances.

ing standpoint, to be a catalyst for such drastic action.[21] (The plaintiffs even seem to concede that § 9C, as interpreted by them, would be of little practical utility in the absence of an over-all budget deficit.) Historically, § 9C has been implemented only when severe reductions in State revenues have threatened the fiscal stability of the Commonwealth.[22] We conclude that the Governor's authority under G. L. c. 29, § 9C, applies only in circumstances when the total available revenues during a fiscal year will be insufficient to meet all of the State's authorized expenditures. See *Brookline* v. *The Governor, supra* at 380.[23] Because § 9C allows the Governor, on notification of such a projected deficiency, to "reduce allotments under [§ 9B]," and contains no restriction as to which allotments,[24] the specific reductions challenged by the plaintiffs were permissible under § 9C.[25]

3. We turn now to the plaintiffs' claim that the above construc-

---

[21]We have searched for legislative history and discovered none that is of any value to this problem of interpretation.

[22]The record indicates that, in 1990, the then Governor authorized § 9C allotment reductions across a wide variety of agencies and programs, in response to a major fiscal crisis. The parties agree that G. L. c. 29, § 9C, has been invoked very sparingly.

[23]In *Brookline* v. *The Governor*, 407 Mass. 377 (1990), this court upheld a challenge to the Governor's authority under G. L. c. 29, § 9C, to withhold funds for local school aid, commonly called Chapter 70 aid, appropriated in the fiscal year 1990 budget. Because we held in that case that the funds at issue were not "made available . . . to [S]tate agencies under the control of the governor or a secretary," and so were not subject to allotment reductions under §§ 9B and 9C, see *id.* at 381, we did not reach issues, raised by the plaintiffs and amici, regarding in what circumstances § 9C allotment reductions properly may be made. See *id.* at 381-382 n.5; *id.* at 386 (Liacos, C.J., concurring). We note, however, that, in the *Brookline* opinion, we generally described § 9C as a statute that "allows the Governor to reduce allotments under § 9B, in certain circumstances, when available revenues during a fiscal year will be insufficient to meet authorized expenditures." *Id.* at 380. This description fully comports with our interpretation of the statute today.

[24]We reject the plaintiffs' summary argument that we should limit the Governor's authority under G. L. c. 29, § 9C, to make only "pro rata reductions across all line 'item appropriations to be paid out of a particular fund," or, alternatively, across all expenditures subject to allotment under § 9B. A requirement that a budget shortfall must be addressed with uniform allotment reductions is noticeably absent from the statute and, in our opinion, could produce arbitrary results. See *Opinion of the Justices*, 375 Mass. 827, 836 (1978).

[25]No one can disagree with the fact that the plaintiff organizations provide valuable and much needed public health services to communities of the

tion of G. L. c. 29, § 9C, renders the statute unconstitutional. The plaintiffs assert that the appropriation process is the primary vehicle through which "the Legislature exercises its lawmaking power to accomplish social purposes." *Opinion of the Justices*, 375 Mass. 827, 832 (1978). They argue, in essence, that our conclusions stated above impermissibly vest in the Governor plenary power to effectively "reallocate over [sixty per cent]²⁶ of the budget as she sees fit," and "to eliminate entirely programs and services for which the Legislature made explicit provision through the appropriation process." The plaintiffs assert that § 9C thus constitutes an unlawful delegation of the Legislature's authority to appropriate funds in violation of art. 30. We disagree.

We have defined the power of appropriation as the authority "to set apart from the public revenue a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object and for no other." *Opinion of the Justices*, 323 Mass. 764, 766 (1948), quoting *State* v. *Moore*, 50 Neb. 88, 96 (1896). It is beyond question that "[t]he power to appropriate money of the Commonwealth is a legislative power. Under the Constitution it can be exercised only by the General Court and in the particular manner prescribed." *Opinion of the Justices*, 302 Mass. 605, 612 (1939). See *Opinion of the Justices*, 375 Mass. at 832. It is equally clear, however, that "the activity of spending money is essentially an executive task." *Id.* at 835. Thus, we speak in abstract terms of separation of powers; in reality, some overlap is inevitable, and may well be desirable. See *Chief Admin. Justice of the Trial Court* v. *Labor Relations Comm'n*, 404 Mass. 53, 56 (1989), citing *Opinion of the Justices*, 365 Mass. 639, 641 (1974); *Opinion of the Justices*, 375 Mass. at 835; *Opinion of the Justices*, 302 Mass. at 615. Two key concepts are determinative of our analysis: (1) a statute may not constitutionally allow the Governor to exercise the appropriation power; but (2) a statute may grant the Governor discretion to determine how to spend appropriated funds, or, in

Commonwealth. We are concerned here with the question of the Governor's statutory authority to allocate funds and not with the relative merits of programs affected by her decisions.

²⁶That portion of the budget subject to allocation under G. L. c. 29, § 9B.

limited circumstances, to withhold their expenditure. See *Opinion of the Justices*, 375 Mass. at 835-836; *Opinion of the Justices*, 369 Mass. 990, 993 (1976); *Opinion of the Justices*, 302 Mass. at 614-615. Thus, "[a] distinction must be made between the power of the Legislature to control the expenditure of funds in the sense that it determines the purposes for which expenditures may be made, and the power to control the extent of expenditures committed to a particular purpose." *Opinion of the Justices*, 375 Mass. at 835-836 n.4. We conclude that § 9C is an example of the latter power and constitutes not the legislative power of appropriation, but rather the executive power of expenditure.[27]

Section 9C confers on the Governor neither the authority to set aside money from the treasury to be spent for a particular purpose, nor the authority to direct that any money so appropriated be spent in a manner different from what the Legislature intended. See *id.* at 834-835 n.2 ("the Governor . . . cannot use funds appropriated for one purpose to augment funds earmarked for a second purpose"). Instead, § 9C permits the Governor to use her executive judgment to reduce public expenditures in a time of true financial emergency. See *Opinion of the Justices*, 369 Mass. at 993. This obligation conforms to the constitutional requirement for a balanced budget. See art. 63, § 2, of the Amendments to the Massachusetts Constitution, as amended by art. 107 of the Amendments. It reflects a legislative determination that the Commonwealth's need to remain solvent overrides particular statements of social policy contained in those appropriation items subject to allotment under § 9B. It is an expression of the Legislature's recognition that the executive branch has the "detailed and contemporaneous knowledge regarding spending decisions" to enable necessary reductions to be made on an expedited basis, and the Legislature's confidence

---

[27]The parties cite to decisions of appellate courts from other States. Some, considering statutory schemes that operate in essentially the same fashion as ours do, have, not surprisingly, reached similar results. See, e.g., *University of Conn. Chapter, AAUP v. The Governor*, 200 Conn. 386 (1986). There are some, considering other schemes, that have reached different results. See, e.g., *Chiles v. Children A, B, C, D, E, & F*, 589 So. 2d 260 (Fla. 1991). We do not consider out-of-State authority particularly helpful in construing our statutes or in dealing with the Massachusetts Constitution. See *Barnes v. Secretary of Admin.*, 411 Mass. 822, 829 n.8 (1992), and cases cited.

that they will be made in a manner that will not compromise the achievement of underlying legislative purposes and goals. *Opinion of the Justices*, 375 Mass. at 836.

The probability the Governor might abuse her authority under § 9C to reduce, or eliminate altogether, funding for certain programs based on her own ordering of social priorities, is minimal. "To the contrary, the Governor is bound to apply [her] full energy and resources, in the exercise of [her] best judgment and ability, to ensure that the intended goals of legislation are effectuated." *Id.* at 834. As has been discussed above, allotment reductions under § 9C are applicable only to appropriations to certain State agencies, as provided in § 9B. In addition, § 9C limits the total amount of allotment reductions to an "amount equal to such [revenue] deficiency." Finally, the Governor can reduce only the allotment; the underlying appropriation remains fully in force to establish an upper limit on what may be spent for that line item, should sufficient revenue be forthcoming. It should not be overlooked either that § 9C requires that the Legislature be put on notice when a projected budget deficit triggers the statute's operation. To the extent that the Legislature chooses, it retains full authority to restore funding to programs affected by § 9C allotment reductions, by enacting legislation to transfer funds from the Commonwealth Stabilization Fund or to raise additional revenues to make up for any budget deficiency. Further, the Legislature may pass "conditions" to items in an appropriation bill, exempting the funds in question from allotment reductions under § 9C. See *Opinion of the Justices*, 375 Mass. at 834 n.2. The over-all plan effects a balance between the authority of the executive, who is in charge of the day-to-day operations of a considerable sector of State government, and the authority of the Legislature, which generally has the final word in matters of the purse, and which receives notice of the Governor's actions and has the ultimate right to undo anything done by her under the statute.

4. We remand the case to the county court for the entry of a judgment declaring that the Governor's reduction of allotments pursuant to G. L. c. 29, § 9C, was proper and constitutional.

*So ordered.*