DAVID WILSON vs. COMMISSIONER OF TRANSITIONAL
ASSISTANCE.

Suffolk. March 1, 2004. - June 2, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Moot Question. Practice, Civil,* Moot case, Interlocutory appeal, Appeal.
*Executive. Statute,* Construction, Appropriation of money. *Administrative
Law,* Agency's interpretation of statute. *Transitional Aid for Families with
Dependent Children. Constitutional Law,* Appropriation. *General Court.*

This court concluded that it was appropriate to decide an appeal from the
granting of an injunction concerning the interpretation of a line item in an
appropriation enactment affecting benefits for the elderly, the disabled, and
children, where the case involved substantial questions of public
importance and where the issue was capable of repetition and might evade
review. [850]

In a civil action to enjoin the defendant commissioner of transitional as-
sistance (commissioner) from reducing the level of monthly benefits paid
to the elderly, the disabled, and children under the emergency aid program
during a particular fiscal year, the judge erred in granting a preliminary
injunction, where the plaintiff had not shown a likelihood of success on the
merits of his claim, in that certain provisos contained in a legislative ap-
propriation enactment did not mandate a certain level of benefits, but
rather acted as a directive to the commissioner in the exercise of his
discretion. [850-859] IRELAND, J., with whom GREANEY, J., joined, dissenting.

CIVIL ACTION commenced in the Superior Court Department on
August 15, 2003.

The case was heard by *Mitchell J. Sikora,* J.

The Supreme Judicial Court granted an application for direct
appellate review.

*James J. Arguin,* Assistant Attorney General, for the
defendant.

*Ruth A. Bourquin* for the plaintiff.

SPINA, J. The Commissioner of the Department of Transitional
Assistance (department) appeals from an order that preliminar-
ily enjoined him from reducing the level of monthly benefits
paid to the elderly, disabled, and children under the emergency

aid (EA) program during fiscal year (FY) 2004. See G. L. c. 117A. The commissioner had determined that the benefit reduction was necessary to operate the EA program within the legislative appropriation for the year, but a judge in the Superior Court concluded that the appropriation enactment mandated a minimum level of benefits. We conclude that the commissioner acted within his discretion and that the order granting the injunction must be vacated.

*Background.* The EA program provides benefits to low income elderly and disabled residents and to children who are ineligible for Transitional Aid to Families with Dependent Children benefits. G. L. c. 117A, § 1. The EA program benefits include a monthly payment, emergency rent or mortgage payments, utility arrearage payments, home heating payments, and emergency shelter for individuals without alternative housing. G. L. c. 18, § 2 (D) (*a*)-(*d*). To qualify for EA, an individual's monthly income must be less than $303.70. 106 Code Mass. Regs. §§ 321.260, 321.420, and 321.500 (2003). According to the regulations, eligible recipients may receive a monthly payment of up to $303.70, the "payment standard" in effect since 1991.[1]

On June 20, 2003, the Legislature enacted the budget for FY 2004, appropriating $63,891,268 to the EA program, subject to fifteen provisos, including:

> *proviso 2*: "the payment standard shall equal the payment standard in effect under the general relief program in fiscal year 1991";

> *proviso 3*: "the department may provide benefits to persons age 65 or older who have applied for benefits under chapter 118A of the General Laws, to persons suffering from a medically determinable impairment or combination of impediments which is expected to last for a period as determined by department regulations and which substantially reduces or eliminates the individual's capacity to support himself and which have been verified

---

[1]Under the department's regulations, the payment standard is referred to as the "Standard of Assistance." 106 Code Mass. Regs. §§ 321.260, 321.420, and 321.500 (2003).

by a competent authority, to certain persons caring for a disabled person, to otherwise eligible participants in the vocational rehabilitation program of the Massachusetts rehabilitation commission, and to dependent children who are ineligible for benefits under both chapter 118 of the General Laws and the separate program created by [§ ] 210 of chapter 43 of the acts of 1997 and parents or other caretakers of dependent children who are ineligible under said chapter 118 and under the separate program"

*proviso 8*: "in initially implementing the program for this fiscal year, the department shall include all eligibility categories permitted herein at the payment standard in effect for the former general relief program in fiscal year 1991"

*proviso 9*: "in promulgating, amending or rescinding its regulations with respect to eligibility or benefits, including the payment standard, medical benefits and any other benefits under this program, the department shall take into account the amounts available to it for expenditure by this item so as not to exceed the amount appropriated herein"

*proviso 14*: "notwithstanding any general or special law to the contrary, the funds made available herein shall be the only funds available for the program, and the department shall not spend funds for the program in excess of the amount made available herein"

*proviso 15*: "notwithstanding any general or special law, or of this item to the contrary, 30 days before implementing any eligibility or benefit changes, or both, the commissioner shall file with the clerks of the house of representatives and the senate a determination by the secretary of health and human services that available appropriations for the program will be insufficient to meet projected expenses and a report setting forth the proposed changes." St. 2003, c. 26, § 2, item 4408-1000.

In July, 2003, based on an unexpected increase in the number of persons who became eligible for EA, the commissioner projected that spending for the EA program would exceed the

year's appropriation by $5.9 million.[2] In order to operate the program within the spending limits imposed by the Legislature, the commissioner proposed a reduction in benefits by approximately 11.5%, effective September 1, 2003. Practically, this reduction would affect approximately 16,000 recipients, resulting in a $35 decrease in an individual's typical monthly EA benefit, but would not disturb the benefit level of recipients in rest homes and nursing homes. On August 1, 2003, the commissioner filed the benefit reduction plan with the clerks of the Massachusetts House of Representatives and Senate and notified the chairpersons of the House and Senate Ways and Means Committees of the plan pursuant to proviso 15 of St. 2003, c. 26, § 2, item 4408-1000.

On August 15, 2003, David Wilson, a recipient of EA, filed an action for declaratory and injunctive relief, and moved for a preliminary injunction to enjoin the commissioner from implementing the benefit reduction. His primary contention was that proviso 2 mandates a minimum payment of benefits. A judge in the Superior Court agreed and entered an order on August 21, 2003, preliminarily enjoining the commissioner from reducing EA benefits and from notifying recipients of the benefit reduction. The order further provided that the commissioner "may move for reconsideration of this ORDER if the present funds approach exhaustion and if the Legislature does not furnish timely supplemental appropriations." The commissioner appealed pursuant to G. L. c. 231, § 118, second par., and we granted his application for direct appellate review.

In November, 2003, the Legislature approved, and the Governor did not veto, a supplemental budget for an additional $2.4 million in funding for the EA program in FY 2004. See St. 2003, c. 140, § 2, item 4408-1000. On March 5, 2004, the Legislature provided the supplemental money necessary to fund the EA program for the remainder of the fiscal year at the 1991 payment standard. St. 2004, c. 40.

---

[2]The Legislature's appropriation for FY 2004 was sufficient to provide emergency aid (EA) benefits to an average of 15,757 cases a month at the existing benefit standard. However, based on the sharp increase in the July, 2003, caseload, the commissioner estimated that the average caseload for FY 2004 would be 17,335 cases a month. The average caseload over the prior two years had been 15,483.

*Mootness.* The commissioner suggests that the appeal is now moot, but that we should exercise our discretion and decide the case because "the question is one of public importance, is very likely to arise again in similar circumstances, and . . . appellate review could not be obtained before the question would again be moot." *Attorney Gen.* v. *Commissioner of Ins.,* 403 Mass. 370, 380 (1988). Wilson does not oppose the commissioner's suggestion, but has expressed concerns about the likelihood that a similar case is likely to arise again, and that review could not be obtained before the question would again become moot.

However, assuming the case is moot,[3] we agree that the case involves substantial questions of public importance, including the ability of the executive branch to exercise discretion in spending monies appropriated by the Legislature for the EA program, as well as constitutional and statutory principles concerning spending within a legislative appropriation. The issues have been fully briefed and argued by both sides. See *Ott* v. *Boston Edison Co.,* 413 Mass. 680, 683 (1992). The situation is likely to arise again in similar circumstances. Although this case involves the interpretation of a line item in an appropriation enactment, the text of the line item appropriations for the EA program has remained essentially the same since FY 1992, and this is the second fiscal year in which there has been litigation challenging the commissioner's authority to reduce benefits in order to keep EA program spending within appropriation levels. Joslin *vs.* Commissioner of Transitional Assistance, Suffolk Superior Court No. 01-0803. The issue is capable of repetition, and may well evade review, where the cycle in which the issue will likely arise is the fiscal year and where mootness may develop as a result of legislative response. For these reasons, we think it is appropriate to decide this appeal.

*Discussion.* The commissioner claims that the judge erred because proviso 2 does not preclude a reduction in the EA benefit standard and that the benefit reduction plan is a matter

---

[3]We note that, although the commissioner has no present intention to reduce the payment standard, a final judgment has not entered, the fiscal year has not ended, and the preliminary injunction is therefore still in effect. See *Matter of McKnight,* 406 Mass. 787, 792-793 n.4 (1990); *Stathopoulos* v. *Reeksting,* 252 Mass. 542, 544 (1925).

of spending committed to his discretion. Wilson argues that (1) the plain language of proviso 2 requires the Department of Transitional Assistance to maintain the payment standard in effect in fiscal year 1991 until appropriated funds are depleted; and (2) the commissioner's plan to reduce the payment standard, if implemented, will cause immediate and irreparable harm to EA recipients.

When reviewing interlocutory injunctive orders, we examine the "same factors properly considered by the judge in the first instance," *Packaging Indus. Group, Inc.* v. *Cheney*, 380 Mass. 609, 616 (1980), see *Boston Athletic Ass'n* v. *International Marathons, Inc.*, 392 Mass. 356, 362 n.7 (1984), to determine whether there was an abuse of discretion. See *Lawless-Mawhinney Motors, Inc.* v. *Mawhinney*, 21 Mass. App. Ct. 738, 743 (1986). For the denial or issuance of a preliminary injunction, a judge conducts an "initial evaluation in combination of the moving party's claim of injury and its chance of success on the merits." *Packaging Indus. Group, Inc.* v. *Cheney*, *supra* at 617. If the moving party demonstrates both a likelihood of success on the merits and a substantial risk of irreparable harm, such harm is to be balanced against a risk to the nonmoving party. See *Commonwealth* v. *County of Suffolk*, 383 Mass. 286, 288 (1981).

We first consider whether Wilson has shown a likelihood of success on the merits. See *Healey* v. *Commissioner of Pub. Welfare*, 414 Mass. 18, 21 (1992). We apply established rules of statutory construction to the provisos of a line item in a legislative appropriation. See *Woods* v. *Executive Office of Communities & Dev.*, 411 Mass. 599, 604 (1992). While an agency's interpretation of a statute is not binding on the courts, we give deference to the enforcing agency's statutory construction. See *Amherst-Pelham Regional Sch. Comm.* v. *Department of Educ.*, 376 Mass. 480, 491 (1978).

Wilson contends that proviso 2, which states "the payment standard *shall* equal the payment standard in effect under the general relief program in fiscal year 1991" (emphasis added), imposes a "categorical requirement" that the 1991 payment

standard be maintained for the duration of the program.[4] Taken in isolation, this proviso would appear to compel such an interpretation. See *Hashimi* v. *Kalil*, 388 Mass. 607, 609 (1983) (word "shall" generally interpreted as imposing mandatory obligation). However, proviso 9 of the line-item acknowledges the authority of the commissioner to amend all "benefits, including the payment standard." Wilson argues that, when read in context with the other provisos, proviso 9 is a limitation on the commissioner's authority to amend the department's regulations. That limitation, he contends, permits amendment of the regulations "only if the changes will not force the program to exceed appropriations." By way of example of the internal harmony he claims his interpretation brings to the enactment as a whole, see *Globe Newspaper Co.* v. *Commissioner of Educ.*, 439 Mass. 124, 129-131 (2003), Wilson explains that, "if the entire appropriation were depleted and [the department] had to stop paying benefits altogether so as not to run afoul of constitutional restrictions against spending funds that have not been appropriated . . . [a]t that point, [the department] could [amend its regulations and] reduce the payment standard to zero for the remainder of the fiscal year." We are certain that the Legislature did not contemplate such an approach, which runs contrary to established principles of appropriation and expenditure.

The commissioner argues that the provisos can be reconciled by construing the word "shall" appearing in proviso 2 as a directive, rather than a mandatory provision.[5] He contends that such a construction would give meaning to all the provisos while simultaneously preserving the dominant purpose of the EA program, namely, creation of "a program of emergency aid . . . subject to appropriation." G. L. c. 117A, § 1. See *Swift* v. *Registrars of Voters of Quincy*, 281 Mass. 271, 276 (1932)

---

[4]This proviso has been included in every general appropriation act since the program's inception in 1991.

[5]Wilson argues that the requirement in proviso 8 that the program "initially . . . include all eligibility categories . . . at the payment standard in effect . . . in [FY] 1991" serves only to allow the department to alter criteria for eligibility, not the payment standard. His argument fails because the two concepts are linked together by the wording of proviso 8. Moreover, the unambiguous language of proviso 9 identifies both the eligibility *and* the 1991 payment standard as susceptible to change by the commissioner.

("shall" becomes permissive when necessary to comply with dominant purpose). We agree.

Seemingly contradictory provisions of a statute must be harmonized so that the enactment as a whole can effectuate the presumed intent of the Legislature. See *Risk Mgt. Found. of the Harvard Med. Insts., Inc.* v. *Commissioner of Ins.*, 407 Mass. 498, 503 (1990). Construing the word "shall" in its directive sense as it appears in provisos 2 and 8, see *Boston* v. *Quincy Mkt. Cold Storage & Warehouse Co.*, 312 Mass. 638, 646-647 (1942), all the provisos work together harmoniously to effectuate the legislative purpose. Provisos 2, 3, and 8 taken together create a starting point for the department for the fiscal year. St. 2003, c. 26, § 2, line item 4408-1000. Proviso 8 explains: "in initially implementing the program for this fiscal year, the department shall include all eligibility categories permitted herein [proviso 3] at the payment standard in effect for the former general relief program in fiscal year 1991 [proviso 2]." In other words, the department must begin the fiscal year with the presumption that it will provide benefits to all the categories listed in the statute at the 1991 payment standard. See *id.* Proviso 14 directs the department to spend only the money appropriated to the EA program account for that fiscal year. To that end, proviso 9 requires the department to promulgate or amend its regulations regarding eligibility or benefits, including the payment standard, so as not to exceed the appropriated funds. Through proviso 9, the Legislature anticipates and addresses what the department may do in the event that the demand for EA assistance will exhaust its appropriation if the initial level of benefits and scope of eligibility remain in place. See *id.* This scheme, which presumes a given scope of eligibility and a given level of benefits, but allows changes to accommodate perceived budgetary shortfalls, makes eminent sense in light of proviso 15, which requires the commissioner to notify the Legislature thirty days before making any adjustments to eligibility or benefits. *Id.* The notice requirement allows the Legislature either to authorize the adjustment passively by doing nothing, or to preempt the adjustment by providing ad-

ditional funding through a supplemental appropriation.[6] See *Pulsone* v. *Public Employment Retirement Admin. Comm'n*, 60 Mass. App. Ct. 791, 797 (2004).

Contrary to the construction advanced by Wilson, a general appropriation bill, which is based on a budget recommended by the Governor, is intended to pay for "all proposed expenditures of the commonwealth for the fiscal year." Article 63, § 2, of the Amendments to the Massachusetts Constitution, as amended by art. 107 of the Amendments. See art. 63, § 3, of the Amendments. See also *Opinion of the Justices*, 375 Mass. 851, 853 (1978). We presume that the Legislature appropriated funds for the EA program in its FY 2004 general appropriation to cover maintenance of the program for the entire fiscal year. Although there are instances where the purpose of a particular appropriation may either permit or require use of the entire appropriation in a shorter period of time, such as a construction project, there is nothing in the appropriation for the EA program to suggest that that is the case here. Neither party argues that the EA program is designed to eliminate poverty, such that the appropriation should be spent down quickly in order to achieve that desired goal. Sensibly viewed, it is a program, not a project, meant to operate over the course of the entire fiscal year to alleviate the effects of poverty over that period, not just until the funds are depleted.

The construction of the provisos advanced by the commissioner is consistent with fundamental principles concerning the expenditure of appropriations based on executive discretion.[7] See *Opinion of the Justices*, 375 Mass. 827, 835-836 (1978) (discretion of executive officers in spending appropriated funds is constitutionally based and necessary for effective government). The discretion afforded to the commissioner lies in how, not when, the money is spent for the program for which it was appropriated. *Id.* at 836-837. In this case, the commis-

---

[6]There have been at least two years when the Governor struck the notice requirement and the Legislature did not override the line item veto. See St. 2002, c. 184, § 2, line item 4408-1000; St. 1998, c. 194, § 2, line item 4408-1000; and at least one year when the Legislature did not include the notice requirement at all, St. 1999, c. 127, § 2, line item 4408-1000.

[7]Wilson concedes that the commissioner is permitted to take steps to close a projected deficit.

sioner had discretion to adjust either the program's eligibility categories or payment standard, or both, in order to stay within the appropriated funding until the fiscal year's end, as long as he gave the Legislature the requisite advance notice under proviso 15 of the proposed adjustments (and thereby an opportunity to appropriate additional funds to avert the need for such adjustment).

In addition, G. L. c. 29, § 9B, "requires the Governor to divide annual appropriations made to State agencies into periodic allotments which represent the total amount of money that the agency may spend during that period." *New England Div. of the Am. Cancer Soc'y* v. *Commissioner of Admin. & Fin.*, 437 Mass. 172, 175 n.9 (2002). The Governor usually allocates a program's appropriated funding proportionately over the twelve-month period of a fiscal year. See *Brookline* v. *The Governor*, 407 Mass. 377, 381 (1990). The commissioner is required by G. L. c. 29, § 9B, based on projected expenditures over the fiscal year, to spend conformably within the Governor's allocation.[8] *New England Div. of the Am. Cancer Soc'y* v. *Commissioner of Admin. & Fin.*, *supra* at 184-185.

Wilson argues that the reference in proviso 9 to amendment of the payment standard concerns benefits other than the 1991 payment standard, such as the rent allowance. We disagree. The plain language of proviso 9 refers to the "payment standard" in effect in 1991, a component of benefits altogether different from the rent allowance. If the Legislature intended to limit the commissioner's discretion to the rent allowance, it would have said so, and it has not.[9]

Wilson insists that the commissioner should have applied the

---

[8]Executive agencies are constitutionally forbidden from making expenditures that exceed legislative appropriation. See Part II, c. 2, § 1, art. 11, of the Massachusetts Constitution, and art. 63, of the Amendments to the Massachusetts Constitution. By stating that the department is "not to exceed the amount appropriated herein" in proviso 9 and that "the funds made available herein shall be the only funds available for the program" in proviso 14, the Legislature clearly intended that the commissioner would manage the EA program within that constitutional framework.

[9]Wilson also argues that the Legislature did not intend to allow for a reduction in the payment standard based on its use of the phrase "to the extent feasible within the appropriation" regarding benefits such as the rent allowance and the office hours of department workers. Proviso 9 of the current line

1991 payment standard until the appropriated funds were exhausted, presumably in May, 2004. General Laws c. 29, § 9B, prohibits such action. The statute provides that the appropriation is to be spent according to the following formula: "the annual sum available for expenditure divided by twelve multiplied by the number of months in the allotment period." The commissioner's proposed benefit reduction was intended to contain spending in a manner contemplated by the statute.

In support of his theory, Wilson relies on the Legislature's history of responding to the depletion of appropriated money by providing supplemental funding to maintain the EA program for the duration of the fiscal year. Although the Legislature has provided supplemental monies for programs with nearly depleted funds in the past, it is not required to do so. To force the commissioner to rely on past responses from the Legislature would only jeopardize the viability of a program that serves the Commonwealth's neediest residents. The commissioner's decision to provide continuity of benefits for all eligible residents for the duration of the year, albeit at a lower level, versus risking the depletion of funds and a total disruption of benefits absent a supplemental appropriation, is a decision that lies within his discretion. His exercise of that discretion is entitled to deference. See *Dowell* v. *Commissioner of Transitional Assistance*, 424 Mass. 610, 615 (1997). The Legislature has in fact imposed an advance notice requirement, proviso 15, so that it may respond immediately to this exercise of discretion. That mechanism suggests clear legislative intent that the commissioner have such discretion in the first place.

Wilson also contends that the Governor and the commissioner were required to seek a supplemental appropriation to get the EA program through the fiscal year. They were not so obliged. In the circumstances, neither the Governor nor the commissioner was required to seek a supplemental appropriation because neither had proposed spending an amount greater

item unambiguously provides for amendments to benefits, "including the payment standard . . . tak[ing] into account the amounts available to it for expenditure by this item so as not to exceed the amount appropriated herein." This language, similar to that used in former provisos regarding other benefits, allows for a reduction in the payment standard based on budget constraints.

than the amount allocated under the statutory formula in G. L. c. 29, § 9B.[10]

Faced with an increase of almost 2,000 EA recipients in July, 2003 (see note 2, *supra*), the commissioner could have determined that in order to comply with his duty to operate within the appropriation, he would reduce the number of recipients under the EA program by changing the criteria for eligibility and leaving the payment standard at the 1991 level. See *Dowell* v. *Commissioner of Transitional Assistance, supra* at 615. Instead, he exercised his discretion to provide some assistance to all who were then eligible, but at a reduced level of benefits. His decision to administer the EA program within budgetary constraints in that manner fell squarely within the range of permissible discretion, and it should be left undisturbed.[11] *Id.* at 616.

The Legislature may limit the executive branch's well-established spending power by attaching conditions to appropriation items and thereby narrow the purpose for which money is spent. See *Opinion of the Justices*, 375 Mass. 827, 834-835 n.2 (1978). The payment standard set forth in proviso

---

[10]General Laws c. 29, § 9B, states in part: "The governor or commissioner may so allocate a greater amount than required by the formula provided, however, that no less than fifteen days prior to the initial allocation of such greater amount to any account for which a supplemental appropriation will become necessary if current rates of spending continue, the governor or commissioner shall file with the house and senate committees on ways and means a report containing the following information: (1) the amount of the appropriation which the commissioner proposes to allocate; and (2) a detailed corrective action plan to prevent a deficiency in the account or accounts involved; a request for a supplemental or deficiency appropriation, if such corrective action plan would violate the legislative objective of the appropriation; or a statement explaining why neither a corrective action plan nor a supplemental appropriation is necessary."

[11]Wilson also argues that the department's reduction plan runs afoul of the doctrine of separation of powers because the plan violated the Legislature's prerogative to condition appropriation money by requiring that the 1991 payment standard be maintained. See *Opinion of the Justices*, 294 Mass. 616, 621-622 (1936) (imposition of spending conditions is within Legislature's exclusive power of appropriation). Here, there is no violation of the doctrine of separation of powers because, as discussed above, proviso 2 is not a legislative mandate. The commissioner was free to adjust the payment standard, and he complied with the condition of notification by alerting the Legislature of his proposed reduction.

2 is such a condition, but, as discussed above, its scope is limited. That payment standard must be used to open the fiscal year. It is subject to change, however, in the discretion of the commissioner, consistent with his duty to manage the EA program for the entire fiscal year with only the appropriated funds. Proviso 14 states: "[N]otwithstanding any general or *special law* to the contrary . . . the department shall not spend funds for the program in excess of the amount made available herein." Proviso 2 is such a special law, and must yield to budgetary constraints, as required by proviso 14.

The notification requirement in proviso 15 also serves as such a condition. In contrast to the provisions of G. L. c. 29, § 9B, which require notification to the Legislature whenever an agency proposes to spend at a rate faster than the rate determined by the statutory allotment formula, proviso 15 requires notification to the Legislature if the commissioner proposes to stay *within* the periodic allotment by either changing the eligibility criteria, the benefits (including the 1991 payment standards), or both. The advance notice requirement in proviso 15 presupposes that the commissioner has the authority to tighten eligibility criteria and reduce benefits. Its purpose is to alert the Legislature to any such changes, the slightest of which could have dire consequences for recipients. It allows the Legislature the opportunity to avert such consequences by making a supplemental appropriation that enables the commissioner to continue providing benefits at the 1991 level, as has already occurred twice since the commissioner proposed implementing a benefit reduction plan.

Although we sympathize with the recipients, who would bear a significant hardship due to a reduction in the EA payment standard (in the event the Legislature did not respond with a supplemental appropriation), Wilson has failed to show that the commissioner acted unlawfully, so we do not address the question of irreparable harm. See *Healey* v. *Commissioner of Pub. Welfare*, 414 Mass. 18, 28 (1992) (inevitable harm of limiting public resources does not trump lawful department action); *Packaging Indus. Group, Inc.* v. *Cheney*, 380 Mass. 609, 617 (1980) ("What matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but

rather the risk of such harm in light of the party's chance of success on the merits"). Indeed, to require the commissioner to exhaust the appropriated funds before year end would itself cause significant harm. In short, if the funds are insufficient to meet the needs of the EA program, any action the commissioner takes to address that shortfall will, of necessity, cause harm to the affected recipients, and there is nothing the commissioner can do by himself to avert such harm. Under the terms of proviso 15 harm is averted by the Legislature, which may, if it chooses, make the supplemental appropriation necessary to maintain current eligibility and benefit standards. Indeed, where Wilson himself contends that the Legislature has always and will always act to remedy any shortfall in the EA program, the commissioner's proposed benefit program reductions will not result in harm. Instead, the proposed benefit reduction will serve as the trigger for additional appropriation from the Legislature. Harm will result if and only if the Legislature instead chooses to let the benefit reduction take effect.

The order for the preliminary injunction is vacated.

*So ordered.*

IRELAND, J. (dissenting, with whom Greaney, J., joins). I respectfully dissent from the court's opinion because, in my view, the motion judge did not abuse his discretion in enjoining the Commissioner of the Department of Transitional Assistance (department) from implementing a planned reduction in the amount of monthly benefits paid to the elderly, disabled, and children under the emergency aid (EA) program during fiscal year 2004.

"Appellate review of a trial court order disposing of a preliminary injunction application . . . focuses on whether the trial court abused its discretion — that is, whether the court applied proper legal standards and whether the record discloses reasonable support for its evaluation of factual questions." *Edwin R. Sage Co.* v. *Foley*, 12 Mass. App. Ct. 20, 25 (1981). See *Lawless-Mawhinney Motors, Inc.* v. *Mawhinney*, 21 Mass. App. Ct. 738, 743 (1986), quoting *New England Patriots Football*

*Club, Inc.* v. *University of Colo.*, 592 F.2d 1196, 1200 (1st Cir. 1979) (appellate court "will not reverse if there is a supportable basis for the . . . action even if, on final analysis, it may prove to be mistaken"). The appellate court will examine "the same factors properly considered by the judge . . . in the first instance. His conclusions of law are subject to broad review and will be reversed if incorrect." *Edwin R. Sage Co.* v. *Foley, supra* at 25-26. However, we are not authorized "to substitute our judgment for that of the trial court where the records disclose reasoned support for its action." *Id.* at 26.

To obtain a preliminary injunction, the applicant must show a likelihood of success on the merits of the underlying claim; actual or threatened irreparable harm in the absence of injunction; and a lesser degree of irreparable harm to the opposing party from the imposition of an injunction. *Packaging Indus. Group, Inc.* v. *Cheney*, 380 Mass. 609, 616-622 (1980). In addition, where, as here, the applicant seeks to enjoin a government action, the court must consider how any public interest would be affected by the requested order. *Id.*[1] See *Smith* v. *Commissioner of Transitional Assistance*, 431 Mass. 638, 652 (2000); *Healey* v. *Commissioner of Pub. Welfare*, 414 Mass. 18, 28 (1992).

The judge did not abuse his discretion in concluding that Wilson demonstrated a likelihood of success on the merits of his claim. I conclude that the judge's decision was well reasoned and had "supportable basis," *Lawless-Mawhinney Motors, Inc.* v. *Mawhinney, supra*. Where, as here, a statute contains seemingly conflicting language, a court must "interpret . . . [it], if possible, so 'as to make it an effectual piece of legislation in harmony with common sense and sound reason,' " *Massachusetts Comm'n Against Discrimination* v. *Liberty Mut. Ins. Co.*, 371 Mass. 186, 190 (1976), quoting *Atlas Distrib. Co.* v. *Alcoholic Beverages Control Comm'n*, 354 Mass. 408, 414 (1968), "tak[ing] care to . . . carry out the legislative intent." *Massachusetts Comm'n Against Discrimination* v. *Liberty Mut.*

---

[1]If the merits are unclear, but the applicant's irreparable harm great, the court may order an injunction on a showing of a "substantial possibility" rather than a "likelihood" of success on the merits. *Packaging Indus. Group, Inc.* v. *Cheney*, 380 Mass. 609, 617 n.12 (1980).

*Ins. Co., supra,* and cases cited. The statute must be viewed "as a whole"; it is "not proper to confine interpretation to the one section to be construed." 2A N. Singer, Sutherland Statutory Construction § 46.05, at 154 (6th ed. 2000).

In accordance with the principles set forth above, and contrary to the commissioner's assertion, the judge did not examine proviso 2 "in virtual isolation" from the other provisos and other relevant statutory language. The judge noted that proviso 2, unlike the other provisos cited by the commissioner in support of his authority to reduce the EA payment standard, was both cast in mandatory terms ("the payment standard *shall* equal the payment standard in effect . . . in fiscal year 1991" [emphasis added]), see *City Bank & Trust Co.* v. *Board of Bank Incorporation,* 346 Mass. 29, 31 (1963) ("The distinction between 'may' and 'shall' is not lightly to be held to have been overlooked in legislation"), and very specific, see *Boston Teachers Union, Local 66* v. *Boston,* 382 Mass. 553, 564 (1981) (specific statutory provision will usually preempt more general one on same subject). After examining several provisos, including proviso 15 (discussed in the court's opinion, *ante* at 848, 853-856, 858), the judge concluded that the provisos taken as "an integrated whole," appeared to "command the [d]epartment to maintain the specific 1991 benefit levels; to stay within the fiscal year appropriation; and to notify the Legislature in advance of a 'projected' shortfall, inferably for remediation by the Legislature itself." The judge, therefore, decided that the provisos did not authorize the department itself to reduce the benefit levels.[2]

This interpretation can, in justice, be no other way, because

---

[2]The judge carefully examined the history of legislative action. He noted that the Legislature has maintained the 1991 payment standard for all thirteen annual appropriations since that date. The judge explained that every time the EA budget approached depletion, the Legislature supplemented it with additional funds. The judge interpreted these actions as an indicator that the Legislature viewed itself as "the primary regulator of the [EA] account." As the court notes, *ante* at 849), after oral argument in this case, the Legislature provided the supplemental money necessary to fund the EA program for the remainder of fiscal year 2004. This supplemental appropriation by the Legislature lends further support to my conclusion that the judge did not abuse his discretion in enjoining the commissioner from reducing the level of

the plaintiff and other EA recipients affected by the department's action live on the margins of subsistence and constitute a class to whom we, as a civilized society, owe a special duty of care. That duty should not be shirked by anything short of a clear and unequivocal legislative command directing the department to do what it did. I doubt that a compassionate Legislature would ever give such a command.

Additionally, I conclude that the judge did not abuse his discretion in concluding that imminent and "irreparable harm" (an 11.5%, or approximately $35 a month, reduction in benefits)[3] to Wilson and similarly situated EA benefit recipients if the injunction did not issue outweighed the purely speculative harm to the department and to the public interest if the injunction issued. See *Healey* v. *Commissioner of Pub. Welfare*, 414 Mass. 18, 28 (1992) (rejecting argument that injunction will harm public interest "by possibly requiring the department to overspend its budget" where there are "several means available" to comply with injunction and "avoid a fund shortage before that issue becomes critical").[4] The judge explained that any harm to the department and the public could be averted

monthly benefits under the EA program.

In addition, the judge acknowledged that an agency's interpretation of its governing statutes is entitled to deference, but explained that in this case, (1) the language of the appropriation act did "not present a technical subject requiring special knowledge," and (2) the pattern of legislative behavior indicated that in the then present "familiar" situation, "supplemental funding . . . rather than an administrative measure" would be a proper solution.

[3]The proposed reduction would decrease the benefit payment of a typical EA recipient from $303 to $268. [RA 102] Because of budgetary constraints, EA recipients have already lost in fiscal year 2004 a rental subsidy of $35 a month. [RA 85, 87] Another benefit reduction would likely endanger a recipient's capacity to pay for food, shelter, and medicine.

[4]In *Healey* v. *Commissioner of Pub. Welfare*, 414 Mass. 18 (1992), the recipients of Aid to Families with Dependent Children (AFDC) obtained a preliminary injunction, enjoining the Department of Public Welfare from failing to provide child-care services to AFDC recipients who participated in approved education or training activities. This court rejected the argument that "the balance of the harms [did] not favor the grant of a preliminary injunction because of the likelihood of harm to other recipients of public assistance whose benefits could be reduced if the department [were] forced to honor the plaintiffs' asserted right to child care." *Id.* at 28. The court concluded that the balance of harms favored the plaintiffs and affirmed the grant of the preliminary injunction. *Id.*

altogether if the Legislature were to appropriate additional funding (as it had done in previous years, during the current fiscal year, and, ultimately, after oral argument in this case, see note 2, *supra*).[5] Because I conclude that there was "a supportable basis" for the judge's action, I would affirm his order allowing Wilson's motion for a preliminary injunction. See *Lawless-Mawhinney Motors, Inc.* v. *Mawhinney*, 21 Mass. App. Ct. 738, 743 (1986) (appellate court will not reverse adequately supported interlocutory injunctive order, even if "on final analysis, it may prove to be mistaken").

---

[5]Additionally, as the court notes, *ante* at 849, the judge's order allowed the commissioner to move for reconsideration if "the present funds approach[ed] exhaustion and if the Legislature [did] not furnish timely supplemental appropriations."