Deanna **BRAYTON**, et al., Respondents,

v.

Tim **PAWLENTY**, et al., Appellants.

No. A10–64.

Supreme Court of Minnesota.

May 5, 2010.

Lori Swanson, Attorney General, Alan I. Gilbert, Solicitor General, John S. Garry, Jeffrey J. Harrington, Assistant Attorneys General, St. Paul, MN, for appellants.

Patrick D. Robben, General Counsel, Office of the Governor, St. Paul, MN, for appellant Governor Tim Pawlenty.

Galen Robinson, David Gassoway, Mid–Minnesota Legal Assistance, Minneapolis, MN, and; Ralonda J. Mason, St. Cloud, MN, for respondents.

Jonathan F. Cohn, Matthew D. Krueger, Sidley Austin LLP, Washington, D.C.; and David F. Herr, Maslon Edelman Borman & Brand, LLP, Minneapolis, MN, for amici curiae Professor David Stras, et al.

Charles D. Roulet, Roulet Law Firm, P.A., Maple Grove, MN, for amici curiae Representative Tom Emmer, et al.

David L. Lillehaug, Lousene M. Hoppe, Fredrikson & Byron, P.A., Minneapolis, MN, for amicus curiae Minnesota House of Representatives.

Martin A. Carlson, Law Offices of Martin A. Carlson, Ltd., Minneapolis, MN, for amici curiae Common Cause Minnesota and League of Women Voters Minnesota.

Thomas L. Grundhoefer, Susan L. Naughton, League of Minnesota Cities, St. Paul, MN, for amici curiae League of Minnesota Cities, et al.

## OPINION

MAGNUSON, C.J.

This case presents questions about the authority of Minnesota's executive branch under Minn.Stat. § 16A.152, subd. 4

(2008), to reduce allotments in order to avoid deficit spending. The Ramsey County District Court held that use of the statutory unallotment authority to reduce funding for the Minnesota Supplemental Aid–Special Diet Program in the circumstances of this case violated separation of powers principles. We affirm, although on different grounds.

Six Minnesota residents who qualify for payments under the Minnesota Supplemental Aid—Special Diet (Special Diet) Program brought an action seeking declaratory and injunctive relief. These plaintiffs, respondents on appeal, challenge the validity of reductions made by the executive branch to unexpended allotments of appropriated funds available for payments under the Special Diet Program for the 2010–2011 biennium, which began July 1, 2009, and ends June 30, 2011. The plaintiffs assert that the reductions in allotments to the Special Diet Program violate the terms of the unallotment statute, Minn.Stat. § 16A.152, subd. 4, and are unconstitutional as a violation of separation of powers. The defendants, appellants on appeal, are Governor Tim Pawlenty and the Commissioners of the Departments of Management and Budget, Human Services, and Revenue.[1]

As part of the obligation to "manage the state's financial affairs," Minn.Stat. § 16A.055, subd. 1(a)(2) (2008), the Commissioner of Minnesota Management and Budget (MMB), is required to "prepare a forecast of state revenue and expenditures" in February and November of each year. Minn.Stat. § 16A.103, subd. 1 (2008). The Commissioner's November 2008 forecast for the 2010–2011 biennium projected a deficit of $4.847 billion, based on anticipated revenues of $31.866 billion.

The Commissioner's February 2009 forecast projected a deficit of $4.57 billion, based on anticipated revenues of $30.7 billion.

In January 2009, the Governor submitted a proposed budget to the Legislature with anticipated revenues of $31.07 billion. In March 2009, after the February 2009 forecast, the Governor submitted a revised budget to the Legislature based on anticipated revenues of $29.905 billion. An April 2009 economic update from MMB showed February and March revenues as $46 million less than projected in the February forecast.

On May 9, 2009, the Governor vetoed a revenue bill that increased taxes in order to meet the anticipated revenue shortfall. The Legislature was unsuccessful in its attempt to override the veto. Between May 4 and May 18, the Legislature passed and presented to the Governor appropriation bills for the 2010–2011 biennium. These appropriation bills reduced spending below the levels projected in the February 2009 forecast so that the projected deficit of $4.57 billion was reduced to $2.7 billion. The Governor signed the appropriations bills into law, exercising a limited number of line-item vetoes not at issue here. House File 1362, the Omnibus Health and Human Services Bill, which provided funding for the Special Diet Program that is at issue in this case, became law on May 14. Act of May 14, 2009, ch. 79, 2009 Minn. Laws 690.

On May 18, 2009, the same day it was required to adjourn, the Legislature passed House File 2323, another revenue bill that would raise taxes to address the $2.7 billion projected deficit remaining after enactment of the appropriations bills.

---

1. Although the commissioners of the three departments are appellants, unless otherwise noted, references in this opinion to the Commissioner mean the Commissioner of Minnesota Management and Budget, who implements the challenged statute.

As he had done with the prior revenue enactment, the Governor vetoed the second revenue bill. Because the Legislature had adjourned by the time of the veto, the $2.7 billion projected deficit remained. The Governor did not call a special session of the Legislature.

The Minnesota Constitution allows the state to borrow money for only limited purposes. *See* Minn. Const. art. XI. As a result, the state's biennial operating budget must be balanced—that is, expenditures cannot exceed revenues for the biennium. The statute at issue in this case, Minn.Stat. § 16A.152, subd. 4 (the unallotment statute), provides the executive branch with a means to address a budget deficit, including creation of and authorization to use a budget reserve fund and, if the reserve fund is depleted, authority to reduce unexpended allotments. The statute provides:

(a) If the commissioner determines that probable receipts for the general fund will be less than anticipated, and that the amount available for the remainder of the biennium will be less than needed, the commissioner shall, with the approval of the governor, and after consulting the Legislative Advisory Commission, reduce the amount in the budget reserve account as needed to balance expenditures with revenue.

(b) An additional deficit shall, with the approval of the governor, and after consulting the legislative advisory commission, be made up by reducing unexpended allotments of any prior appropriation or transfer. Notwithstanding any other law to the contrary, the commissioner is empowered to defer or suspend prior statutorily created obligations which would prevent effecting such reductions.

(c) If the commissioner determines that probable receipts for any other fund, appropriation, or item will be less than anticipated, and that the amount available for the remainder of the term of the appropriation or for any allotment period will be less than needed, the commissioner shall notify the agency concerned and then reduce the amount allotted or to be allotted so as to prevent a deficit.

(d) In reducing allotments, the commissioner may consider other sources of revenue available to recipients of state appropriations and may apply allotment reductions based on all sources of revenue available.

(e) In like manner, the commissioner shall reduce allotments to an agency by the amount of any saving that can be made over previous spending plans through a reduction in prices or other cause.

Minn.Stat. § 16A.152, subd. 4. An "appropriation" is the Legislature's authorization "to expend or encumber an amount in the treasury." Minn.Stat. § 16A.011, subd. 4 (2008). The executive branch "allots" the appropriated funds for spending throughout the biennium. Minn.Stat. § 16A.011, subd. 3 (2008) (" 'Allotment' means a limit placed by the commissioner on the amount to be spent or encumbered during a period of time pursuant to an appropriation.").

In a June 4, 2009, letter, the Commissioner informed the Governor that the conditions to trigger application of the unallotment statute existed and that it would be necessary to reduce allotments to avoid a deficit. In the letter, the Commissioner stated: "I have determined, as defined in Minnesota Statute 16A.152, that 'probable receipts for the general fund will be less than anticipated, and that the amount available for the remainder of the [2010–2011] biennium will be less than needed.' " The Commissioner further explained that the February 2009 forecast projected revenues for the biennium of $30.7 billion—$1.2 billion less than anticipated in the Novem-

ber 2008 forecast—and that based on the bills enacted by the Legislature and signed by the Governor, forecasted revenues would result in a $2.7 billion shortfall for the biennium. The Commissioner also noted that the national economy had worsened since the February forecast and that year-to-date receipts for Fiscal Year (FY) 2009 were down $70.3 million compared to the February forecast.

On June 16, 2009, in accordance with subdivision 4 of section 16A.152, the Commissioner proposed allotment reductions to the Governor. The Commissioner met twice with the Legislative Advisory Commission to report on the allotment reductions. The Governor approved proposed allotment reductions of approximately $2.5 billion on July 1, the first day of the biennium, and the Commissioner implemented the unallotments beginning that month. The Commissioner notified the legislative budget committees of the unallotments within 15 days, as required by Minn.Stat. § 16A.152, subd. 6 (2008). Some of the unallotments were effective for both the first and second years of the biennium; some were effective for only the second year of the biennium which begins on July 1, 2010. These changes were effected not only by reducing the number of dollars for specific allotments, but in some instances, by changing substantive criteria that established eligibility for payments or formulas for spending.[2] In addition to the $2.5 billion of unallotments, the Commissioner implemented $210 million in administrative

savings to make up the remainder of the $2.7 billion projected deficit.

The unallotment at issue in this appeal affected funding for the Special Diet Program. The Special Diet Program is part of a broader Minnesota Supplemental Aid (MSA) program, which provides monthly cash payments to supplement federal Supplemental Security Income benefits. *See* Minn.Stat. §§ 256D.33–.54 (2008). The Special Diet Program provides for payments to qualified MSA participants on medically prescribed diets. Minn.Stat. § 256D.44, subd. 5(a). That statute requires county agencies to pay monthly allowances to qualified individuals based on United States Department of Agriculture standards as specifically set out in the statute. *Id.* The Special Diet Program funding is included in the general appropriation to the Department of Human Services for all MSA programs. Act of May 14, 2009, ch. 79, art. 13, § 3, subd. 4(j), 2009 Minn. Laws 690, 991.

The MSA appropriation was $33.93 million for FY 2010 and $35.19 million for FY 2011. *Id.* The Commissioner reduced allotments from the MSA appropriations by $2.866 million for FY 2010 and $4.3 million for FY 2011, including allotment reductions to the Special Diet Program of $2.133 million for FY 2010 and $3.2 million for FY 2011. The effect of these unallotments was to eliminate Special Diet Program payments from November 1, 2009, through June 30, 2011, the end of the biennium.

---

2. For example, the other unallotment challenged in this lawsuit, but not part of this appeal, was to the renters' property tax refund program. Under this program renters are eligible for a refund of a portion of the rent they pay based on a percentage that the Legislature deems attributable to property taxes. The unallotment was accomplished by changing the portion of rent used to calculate the refund from 19% of rent paid, as set by the Legislature, to 15%. Another example is the unallotment for the Medical Assistance Program. The eligibility criteria are established in statute, including the asset limitations of $20,000 for a household of two or more people and $10,000 for a household of one person. *See* Minn.Stat. § 256B.056, subd. 3c (2008). The unallotment was accomplished by reducing those limits to $6,000 and $3,000, respectively.

The plaintiffs filed their complaint on November 3, 2009, in Ramsey County District Court. The plaintiffs moved for a temporary restraining order requiring the defendants to reinstate the Special Diet Program funding while the action was pending, and the defendants moved to dismiss the complaint.

In an order and memorandum filed on December 30, 2009, the district court granted plaintiffs' motion for a temporary restraining order. The court enjoined defendants from reducing the allotment to the Special Diet Program, retroactive to November 1, 2009, and until further order of the court.

The district court concluded that it was bound by *Rukavina v. Pawlenty*, 684 N.W.2d 525 (Minn.App.2004), *rev. denied* (Minn. Oct. 19, 2004), a court of appeals case holding that subdivision 4 of section 16A.152 is constitutional. Nonetheless, the district court held that "[i]t was the specific manner in which the Governor exercised his unallotment authority that trod upon the constitutional power of the Legislature." The court did not expressly find that the executive branch had failed to comply with the requirements of the statute. The court concluded, however, that because the projected budget shortfall "was neither unknown nor unanticipated when the appropriation bills became law," the executive branch's use of the unallotment authority was invalid. The court stated:

> The authority of the Governor to unallot is an authority intended to save the state in times of a previously unforeseen budget crisis, it is not meant to be used as a weapon by the executive branch to break a stalemate in budget negotiations with the Legislature or to rewrite the appropriations bill.

Shortly after the temporary restraining order ruling, the parties stipulated to the denial of defendants' motion to dismiss regarding the Special Diet Program funding and to entry of final judgment under Minn. R. Civ. P. 54.02 in favor of plaintiffs on that claim. The district court entered a final partial judgment, and defendants filed a notice of appeal to the court of appeals and petitioned for accelerated review in this court. We granted accelerated review and ordered expedited briefing and oral argument.

## I.

Appellants here, defendants below, argue that the district court erred in concluding that the unallotment authority in subdivision 4 of section 16A.152 can be exercised only for budget deficits unforeseen while the Legislature is in session. Appellants contend that the challenged unallotment action was consistent with the plain language of the statute, and that even if the statute is ambiguous, their interpretation that there are no temporal restrictions on the statute's triggering conditions is supported by the canons of statutory construction.

Appellants also contend that because respondents did not challenge the constitutionality of the unallotment statute in the district court, that issue is not properly before us. Appellants argue that if we reach the constitutional question, the statute does not violate separation of powers principles. Appellants assert that the statute does not confer "pure legislative power," because the validity of appropriations is not affected by unallotment. Rather, unallotment is within the authority of the executive branch to administer the laws and the budget. Finally, appellants argue that the statute fully complies with case law requirements for delegation of legislative authority to administrative agencies.

Respondents argue that under the plain language of the statute, the conditions re-

quired to trigger implementation of unallotment contain temporal limitations that precluded unallotment in the circumstances of this case. Specifically, respondents assert that the unallotment authority is intended to be exercised only in the event of unforeseen fiscal conditions that arise after the beginning of a biennium. They maintain that even if the plain language of the statute does not require their interpretation, the canons of construction compel it. Respondents further argue that if we adopt appellants' reading, the statute would allow an unconstitutional infringement on the Legislature's appropriation power because the executive branch could create a deficit situation by refusing to agree on revenue measures and then unilaterally alter spending priorities that had been enacted into law.

## II.

■ We first address the statutory issue raised by the parties. Because we conclude the unallotment at issue here exceeded the scope of the statutory authority, and thus affirm the district court, we do not address the arguments raised concerning the constitutionality of the unallotment action or the statute. *See In re Senty–Haugen,* 583 N.W.2d 266, 269 n. 3 (Minn.1998) (we avoid a constitutional ruling if there is another basis on which we may decide a case).

■ Our goal when interpreting statutory provisions is to "ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2008); *accord Educ. Minn.-Chisholm v. Indep. Sch. Dist. No. 695,* 662 N.W.2d 139, 143 (Minn.2003). The statutory question here is whether the Legislature intended the unallotment authority conferred on the executive branch in Minn.Stat. § 16A.152, subd. 4, to apply in the circumstances of this case. We determine legislative intent "primarily

from the language of the statute itself." *Gleason v. Geary,* 214 Minn. 499, 516, 8 N.W.2d 808, 816 (1943). If the text is clear, "statutory construction is neither necessary nor permitted and [we] apply the statute's plain meaning." *Am. Tower, L.P. v. City of Grant,* 636 N.W.2d 309, 312 (Minn.2001). But if a statute is ambiguous, we apply canons of construction to discern the Legislature's intent. *See* Minn.Stat. § 645.16 (2008).

■ The parties offer competing interpretations of the language of the unallotment statute, as outlined above. Both sides argue that the plain language of the unallotment statute supports their interpretation. Plain language controls only if the text of the statute is unambiguous, that is, if the language is susceptible to only one reasonable meaning. *Kratzer v. Welsh Cos., LLC,* 771 N.W.2d 14, 21 (Minn.2009). The first question we address, then, is whether only one of the proffered interpretations of the statute is reasonable.

Respondents' interpretation, accepted by the district court, is a reasonable reading of the statute, particularly when the two clauses of section 16A.152, subdivision 4(a) ("probable receipts for the general fund will be less than anticipated, and that the amount available for the remainder of the biennium will be less than needed") are read as a whole and the words are interpreted in accordance with their common meanings. *See* Minn.Stat. §§ 645.08, 645.16 (2008). "Remainder" is defined as a "remaining group, part, or trace." *Merriam–Webster's Collegiate Dictionary* 986 (10th ed. 1993). "Remain" is defined as "to be a part not ... used up." *Id.* The common meaning of "remainder" is thus something less than the whole, after part of the whole has been removed or consumed. Accordingly, the requirement that the Commissioner find that "the amount available for the remainder of the bienni-

um will be less than needed," Minn.Stat. § 16A.152, subd. 4(a), reasonably means that the triggering circumstance (amount less than needed) cannot logically be met until some of the biennium has passed, and that the unallotment process can never apply to a full biennium. Moreover, the two clauses are joined by the conjunctive "and"; when read together, the natural conclusion is that the determination about receipts being "less than anticipated" must be related to "the amount available for the remainder of the biennium."

Appellants present a more strained interpretation of Minn.Stat. § 16A.152, subd. 4(a). The meaning appellants attribute to "remainder"—that the remainder can be the entire biennium before anything is removed—does not comport with the common understanding of that word. On the other hand, appellants are correct that the probable receipts clause contains no express language dictating a timing element for the "less than anticipated" criterion, and the assertion that there is no timing limitation on this triggering condition is not unreasonable. But rather than establishing the plain meaning of that criterion, the absence of any timing definition leaves it ambiguous—subject to precisely the kind of debate about the proper baseline for "less than anticipated" that is presented in this case.

Although the competing interpretations advanced by the parties are each reasonable, that fact simply brings into focus the failure of the statutory language to clearly answer two questions: (1) probable receipts anticipated when? and (2) amount available for what purpose? Because we determine the language of the unallotment statute is ambiguous, we must employ the canons of construction to determine what the Legislature intended by the language it used.

Minnesota Statutes § 645.16 provides that when the words of a law are not explicit, we may ascertain the intention of the Legislature by considering, among other matters:

(1) the occasion and necessity for the law;

(2) the circumstances under which it was enacted;

(3) the mischief to be remedied;

(4) the object to be attained;

(5) the former law, if any, including other laws upon the same or similar subjects;

(6) the consequences of a particular interpretation;

(7) the contemporaneous legislative history; and

(8) legislative and administrative interpretations of the statute.

In addition, the Legislature has provided that courts may be guided by certain presumptions in ascertaining legislative intent, including that "the legislature intends the entire statute to be effective and certain," Minn.Stat. § 645.17(2) (2008), and "the legislature does not intend to violate the Constitution of the United States or of this state," Minn.Stat. § 645.17(3) (2008).

The challenge to the unallotment authority is directly related to the functions of both the legislative and executive branches in establishing the state budget. Accordingly, we must interpret the statute in that context. We therefore briefly review the budget-creation process as it is constitutionally defined, and the roles of the legislative and executive branches.

As the names of the two branches suggest, the legislative branch has the responsibility and authority to legislate, that is, to make the laws, Minn. Const. art. IV, §§ 17–23, and the executive branch has the responsibility and authority to execute, that is, to carry out, the laws, Minn. Const.

art. V, § 3. Under the Separation of Powers Clause, no branch can usurp or diminish the role of another branch. *See* Minn. Const. art. III, § 1. In *State ex rel. Birkeland v. Christianson*, we said:

> The three departments of state government, the legislative, executive, and judicial, are independent of each other. Neither department can control, coerce, or restrain the action or nonaction of either of the others in the exercise of any official power or duty conferred by the Constitution, or by valid law, involving the exercise of discretion. The Legislature cannot change our constitutional form of government by enacting laws which would destroy the independence of either department or permit one of the departments to coerce or control another department in the exercise of its constitutional powers.

179 Minn. 337, 339–40, 229 N.W. 313, 314 (1930).

The Legislature has the primary responsibility to establish the spending priorities for the state through the enactment of appropriation laws. Minn. Const. art. IV, § 22; *id.* art. XI, § 1. The executive branch has a limited, defined role in the budget process. The Governor may propose legislation, including a budget that includes appropriation amounts, which proposals the Legislature is free to accept or reject. But the only formal budgetary authority granted the Governor by the constitution is to approve or veto bills passed by the Legislature. *See* Minn.

Const. art. IV, § 23. With respect to appropriation bills, the constitution grants the Governor the more specific line-item veto authority, through which an item of appropriation can be vetoed without striking the entire bill. *Id.* If the Governor exercises the veto power, the Legislature may reconsider the bill or items vetoed, and if approved by a two-thirds vote, the vetoed bill or item becomes law. *Id.*

Once a bill has been passed by the Legislature and approved by the Governor (or a veto is overridden), the bill becomes law, and the constitutional responsibility of the Governor is to "take care that the laws be faithfully executed." Minn. Const. art. V, § 3. If this process of legislative passage and gubernatorial approval or veto does not succeed in producing a balanced budget within the normal legislative session, the Governor has the authority to call the Legislature into special session. *See* Minn. Const. art. IV, § 12.

After appropriations are enacted, the executive branch undertakes a process of allotment. The Commissioner approves spending plans and establishes spending allotments for segments of the biennium, thereby managing the pace at which executive branch agencies spend their appropriations. *See* Minn.Stat. § 16A.14 (2008). In normal circumstances, the allotment process functions simply as a device to manage the cash flow of the state as the funds appropriated by the Legislature are spent for the purposes intended.[3] Unallot-

---

3. The parties discuss at some length the nature and scope of inherent executive spending authority, and to differing degrees, assert that these principles should guide our decision. We have not previously addressed this authority, but other state courts have. Most courts conclude that the executive branch has some inherent authority and discretion over spending, particularly to spend less than appropriated, but only within the scope of legislatively enacted spending priorities. *E.g., Opinion of*

*the Justices to the Senate*, 375 Mass. 827, 376 N.E.2d 1217, 1223 (1978) ("The constitutional separation of powers and responsibilities, therefore, contemplates that the Governor be allowed some discretion to exercise his judgment not to spend money in a wasteful fashion, provided that he has determined reasonably that such a decision will not compromise the achievement of underlying legislative purposes and goals."); *Hunter v. State*, 177 Vt. 339, 865 A.2d 381, 390–91 (2004) (adopting

ment occurs when the prior spending authorizations are altered, or, as in this case, canceled. The question before us is whether the Legislature intended to authorize the executive branch to use the unallotment process in the circumstances presented here.

■ Appellants and respondents both argue that the purpose of the unallotment statute supports their favored interpretation. See Minn.Stat. § 645.16(1), (4) (court may consider "the occasion and necessity for the law" and "the object to be attained"). Appellants offer a broad purpose for the statute—the elimination of budget deficits—to support their view of the broad reach of the statute.[4] Respondents argue in support of their narrower reading that the statute has the limited purpose of addressing short term, unanticipated deficits.

The distinct roles and powers allocated by the constitution to the two branches in the budget-creation process inform us concerning the purpose and intent of the Legislature in enacting the unallotment statute. The general veto and the line-item veto are the specific tools provided by the constitution to the executive branch for achieving a balanced budget. See Johnson v. Carlson, 507 N.W.2d 232, 235 (Minn. 1993) ("The state constitution, recognizing the governor's oversight responsibilities for the state's budget, provides a gubernatorial line item veto to enable the state's chief executive officer to engage in cost-containment, subject, of course, to the possibility of the veto being overturned."). But we have recognized that the special line-item veto power the constitution confers on the Governor for appropriation bills must be construed narrowly to prevent usurpation of the Legislature's proper authority. Inter Faculty Org. v. Carlson, 478 N.W.2d 192, 194 (Minn.1991).

In the context of this limited constitutional grant of gubernatorial authority with regard to appropriations, we cannot conclude that the Legislature intended to authorize the executive branch to use the

rationale of *Opinion of the Justices* in noting that although the Governor has some discretion in deciding whether to spend appropriated funds, "[i]f the Governor has a free hand to refuse to spend any appropriated funds, he or she can totally negate a legislative policy decision that lies at the core of the legislative function"); *Rios v. Symington*, 172 Ariz. 3, 833 P.2d 20, 23, 29 (1992) (explaining that the Legislature "establishes state policies and priorities and, through the appropriation power, gives those policies and priorities effect" and the executive branch then retains discretion to prevent wasteful spending while still effectuating legislative goals); *Colo. Gen. Assembly v. Lamm*, 700 P.2d 508, 520, 522 (Colo.1985) (recognizing executive "authority to administer the budget" but holding that the authority does not extend so far as to "directly contravene major objectives or purposes sought to be achieved" in an appropriation). The inherent authority of the executive branch concerning actual spending decisions once appropriations are made is not, however, directly implicated in the issue we decide

today, that is, whether Minnesota's unallotment statute was properly invoked in this case.

4. Appellants also argue that the consequences of their interpretation, *see* Minn.Stat. § 645.16(6), and the public interest, *see* Minn. Stat. § 645.17(5), favor their view of the statute, but these arguments are essentially variations of their argument about the statute's purpose. In addition, appellants contend that the Commissioner's interpretation is entitled to deference. *See* Minn.Stat. § 645.16(8). Because the question presented is not one that invokes the expertise of the Commissioner regarding the intricacies of the state budget and his interpretation is not a longstanding one, deference is not warranted. *See Resident v. Noot*, 305 N.W.2d 311, 312 (Minn.1981) (stating that deference to administrative interpretations of statutes is appropriate when the administrators have specialized expertise in the subject of the statute and the interpretation is of long standing).

unallotment process to balance the budget for an entire biennium when balanced spending and revenue legislation has not been initially agreed upon by the Legislature and the Governor. Instead, we conclude that the Legislature intended the unallotment authority to serve the more narrow purpose of providing a mechanism by which the executive branch could address unanticipated deficits that occur after a balanced budget has previously been enacted.[5]

Appellants' interpretation of the unallotment statute envisions a much broader role for the executive branch in the creation of biennial budgets than the process established by the constitution. Under appellants' interpretation of the unallotment statute, the executive branch has authority to modify spending decisions previously enacted into law if revenues projected (apparently at any time) for the biennium fall short of the spending authority in appropriation bills passed by the Legislature and signed by the Governor, whether the shortfall results from revenues lower than projected, a gubernatorial veto of a revenue bill, or legislative failure to pass adequate revenue legislation. The unallotment authority so construed would result in an alternative budget-creation mechanism that bypasses the constitutionally prescribed process. There is nothing to suggest that was the purpose for which the unallotment statute was enacted.[6]

On the contrary, it appears clear to us that the object to be attained, see Minn. Stat. § 645.16(4), was the creation of a mechanism for adjusting expenditures, to be available in the event of an unanticipated revenue shortfall after enactment of a balanced budget. This narrow purpose and interpretation is consistent with and reflected in all prior use of the statute.

5. Courts in several other states have considered similar, but not identical, statutes and resolved both statutory and constitutional challenges to actions taken under those statutes. *See, e.g., New England Div. of the Am. Cancer Soc'y v. Comm'r of Admin.*, 437 Mass. 172, 769 N.E.2d 1248, 1257–58 (2002) (holding that the acting governor complied with terms of Massachusetts' unallotment statute and that the statute was constitutional); *Chiles v. Children A, B, C, D, E, & F*, 589 So.2d 260, 267–68 (Fla.1991) (holding that Florida's unallotment statute was unconstitutional because it did not contain sufficient guidelines to guide the executive branch in exercising delegated authority); *Univ. of Conn. Chapter of AAUP v. Governor*, 200 Conn. 386, 512 A.2d 152, 159 (1986) (upholding the constitutionality of Connecticut's unallotment statute). None of those cases, however, confronted the situation that we face—that is, use of statutory adjustments of legislative spending decisions in the absence of a duly enacted budget. *See, e.g., New England*, 769 N.E.2d at 1249–50 (addressing a challenge to allotment reductions in response to decreased revenue projections that occurred months after the enactment of a budget). As a result, although we may take some guidance from those cases regarding general principles of legislative and executive authority for appropriations and spending, in the end, we can and do resolve the case before us based on our reading of the statute enacted by the Minnesota Legislature. On that point, we find the greatest guidance in our established canons of construction, and the words of the statute before us.

6. Appellants argue that the statute does not allow the executive branch to change the actual amount appropriated, and the executive branch cannot use funds for a purpose different than they are appropriated for, Minn.Stat. § 16A.139 (2008). The result, according to appellants, is that the decisions of the Legislature are not substantively affected by unallotment. But this argument ignores the practical effect of unallotment. Although the funds from a program whose funding is cut are not technically redirected to the program whose funding is not cut, the effect of selective unallotment is the same. Under the unallotments made by the Commissioner, some programs received full funding, some received reduced funding, and some, like the MSA Special Diet program received no funding, effectively eliminating the program which the Legislature had enacted.

*See* Peter S. Wattson, *Legislative History of Unallotment Power* 4–5, 9, 11 (June 29, 2009).

The requirement of a balanced budget as a necessary precursor to the use of the unallotment authority in section 16A.152, subdivision 4, provides necessary meaning to the triggering condition of "receipts less than anticipated." The parties agree that for a current amount of receipts to be "less than anticipated," there must be some past baseline amount to which the current amount is compared. But appellants' argument that there are no temporal limitations on this requirement leaves it entirely untethered—and virtually meaningless—because the executive branch could assign any previous projection of greater revenues as the baseline. This result is contrary to the statutory presumption that "the legislature intends the entire statute to be effective *and certain.*" Minn.Stat. § 645.17(2) (emphasis added). Reading the statute to require enactment of a balanced budget as a predicate to the exercise of unallotment authority provides a definite and logical reference point for measuring whether current revenues are "less than anticipated." The anticipated revenues are measured as of the date the balanced budget is enacted.

This conclusion is bolstered by consideration of the second triggering condition. The only purpose for which revenues would be logically "needed" in the context of the unallotment statute is to fully fund all appropriations. Thus, in order for "probable receipts . . . [to] be less than anticipated, and . . . the amount available for the remainder of the biennium [to] be less than needed," there must have been a point in time when anticipated revenues appeared to be adequate to fund appropriations—i.e., when a balanced budget was enacted.

The temporal limitations implicit in the common meaning of the words "less than anticipated" and "remainder of the biennium" constrain the statute's use to circumstances consistent with the distinct powers and roles conferred on the legislative and executive branches in the constitution. Those circumstances do not include use of unallotment authority to address a deficit known to exist but not resolved by the legislative and executive branches using their constitutionally specified powers to enact spending and revenue legislation. The unallotment statute provides the executive branch with authority to address an unanticipated deficit that arises after the legislative and executive branches have enacted a balanced budget. The statute does not shift to the executive branch a broad budget-making authority allowing the executive branch to address a deficit that remains after a legislative session because the legislative and executive branches have not resolved their differences.

Because the legislative and executive branches never enacted a balanced budget for the 2010–2011 biennium, use of the unallotment power to address the unresolved deficit exceeded the authority granted to the executive branch by the statute. We therefore affirm the district court's conclusion that the unallotment of the Special Diet Program funds was unlawful and void.

Affirmed.

Concurring, PAGE, J.

Concurring, ANDERSON, PAUL H., J.

Dissenting, GILDEA, ANDERSON, G. BARRY, and DIETZEN, JJ.

PAGE, Justice (concurring).

I concur in the opinion of the court that the exercise of unallotment authority at issue in this case was not authorized by

the unallotment statute, Minn.Stat. § 16A.152, subd. 4 (2008). I write separately to highlight my concern that the unallotment statute confers on the executive branch such broad and uncircumscribed authority to rewrite legislative spending decisions that it may constitute an unlawful delegation of legislative authority in violation of the separation of powers principle in our constitution.

Separation of powers is a core feature of our governmental structure, included in our state constitution based on the model of the United States Constitution.[1] The principle originates from the concern "that if all power were concentrated in one branch of government, tyranny would be the natural and probable result." *Wulff v. Tax Court of Appeals,* 288 N.W.2d 221, 222–23 (Minn.1979). Despite the fundamental nature of the separation of powers principle, we have recognized that "there has never been an absolute division of governmental functions in this country, nor was such even intended." *Id.* at 223 (footnote omitted).

Although separation of powers does not require absolute separation of legislative and executive functions, we have long held that the separation of powers principle prohibits legislative delegation of pure legislative power, that is, the power to make the law. For example, in *State v. Great Northern Railway Co.,* 100 Minn. 445, 111 N.W. 289 (1907), we struck down, on separation of powers grounds, a statute that authorized the Railroad and Warehouse Commission to approve capital stock increases for railroad corporations. *Id.* at 470–71, 111 N.W. at 290. We examined at length the necessary separation of powers

distinction between permissible delegation of the power to administer a law and impermissible delegation of the power to make the law. *Id.* at 475–81, 111 N.W. at 292–94. We stated that " '[t]he true distinction is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and the conferring of authority or discretion to be exercised under and in pursuance of the law.' " *Id.* at 477, 111 N.W. at 293 (quoting *State v. Chicago, Milwaukee & St. Paul Ry. Co.,* 38 Minn. 281, 300, 37 N.W. 782, 787–88 (1888), *rev'd on other grounds,* 134 U.S. 418, 10 S.Ct. 462, 33 L.Ed. 970 (1890)). We found the statute at issue constitutionally deficient because it committed "the whole subject of the increase of capital stock by railway corporations to the judgment and discretion of the commission." *Id.* at 479, 111 N.W. at 294.

We reiterated this separation of powers principle in *Lee v. Delmont,* 228 Minn. 101, 36 N.W.2d 530 (1949). We explained that the separation of powers doctrine precludes the Legislature from delegating purely legislative power. *Id.* at 112, 36 N.W.2d at 538. We described "pure legislative power" as "the authority to make a complete law—complete as to the time it shall take effect and as to whom it shall apply—and to determine the expediency of its enactment." *Id.* at 113, 36 N.W.2d at 538.

Under our definition of pure legislative power, the sweeping discretion granted by section 16A.152, subdivision 4, to modify and negate legislative spending decisions raises serious separation of powers concerns. The lack of direction in the Minne-

---

1. Article III, Section 1, of the Minnesota Constitution provides:

    The powers of government shall be divided into three distinct departments: legislative, executive and judicial. No person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others except in the instances expressly provided in this constitution.

sota statute about how unallotment authority may be exercised once it is triggered leaves the executive branch with virtually unfettered discretion to decide which funds to cut entirely, which to reduce in some measure, and which to leave fully funded. Such decisions inevitably change the legislative priorities established in the properly enacted appropriations laws, and the grant in subdivision 4 of section 16A.152 to the executive branch of broad and uncircumscribed authority to make such changes may run afoul of the separation of powers principle. Although we need not decide that issue today, the legislative and executive branches should be aware of that potential problem.

ANDERSON, PAUL H., Justice (concurring).

I join in the concurrence of Justice Page.

ANDERSON, PAUL H., Justice (concurring).

> A legislative, an executive, and a judicial power comprehend the whole of what is meant and understood by government. It is by balancing each of these powers against the other two, that the efforts in human nature towards tyranny can alone be checked and restrained, and any degree of freedom preserved in the constitution.

John Adams, Letter to Richard Henry Lee (Nov. 15, 1775), *in* 4 *The Works of John Adams* 186 (Charles Francis Adams ed., 1851), *quoted in The Oxford Dictionary of American Legal Quotations* 377 (Fred R. Shapiro ed., 1993).

I join in the concurrence of Justice Page because I share his concerns regarding the balance of power between all three branches of government. That said, nothing about my joining in Justice Page's concurrence should be construed to diminish my support for the opinion of the majority, which I support without reservation.

GILDEA, Justice (dissenting).

In our constitution, the people of Minnesota restricted the ability of the state government to deficit spend. The political branches have agreed on a process in the unallotment statute for ensuring that the government meets this obligation. Whether that process is the wisest or most prudent way to avoid deficit spending is not an issue for judicial review. That question should be left to the people themselves to debate and resolve through the political process. The judiciary's "duty" is simply "to apply the law as written by the legislature." *Int'l Bhd. of Elec. Workers, Local No. 292 v. City of St. Cloud,* 765 N.W.2d 64, 68 (Minn.2009) (Magnuson, C.J., for a unanimous court). The majority is unable to do so because the language the Legislature used in the unallotment statute leaves the majority with uncertainty and ambiguity. The majority therefore rewrites the statute to insert additional conditions, and then finds that the Commissioner of Minnesota Management and Budget (Commissioner) violated the statute because he did not comply with the conditions the majority has added.

Unlike the majority, I do not find the language the Legislature used uncertain or ambiguous as applied to the unallotment at issue in this case. I would not rewrite the statute; I would apply the language as written. Because I would hold that the executive branch complied with the plain language of the statute, and that respondents have not met their burden to prove that the statute is unconstitutional, I respectfully dissent.

Respondents challenge the decision of the Commissioner to unallot funds for the Minnesota Supplemental Aid—Special Diet Program (Special Diet Program). The un-

allotment was effective November 1, 2009. The Commissioner carried out the unallotment under Minn.Stat. § 16A.152, subd. 4 (2008). Respondents contend, and the district court held, that the Commissioner did not comply with the statute. Respondents also contend that the statute is unconstitutional. Because I conclude that the Commissioner properly carried out his duties under the statute and because I conclude that respondents have not met their burden to prove that the unallotment statute is unconstitutional, I would reverse.

## I.

I turn first to the question of whether the Commissioner complied with the statute. The Minnesota Legislature has charged the Commissioner with "manag[ing] the state's financial affairs." Minn. Stat. § 16A.055, subd. 1(a)(2) (2008). One of the ways in which the Commissioner performs this management function is to prepare "a forecast of state revenue and expenditures" in February and again in November of each year. Minn.Stat. § 16A.103, subd. 1 (2008). In November 2008, the Commissioner anticipated that the state would receive $31.866 billion in revenue for the 2010–2011 biennium. In February 2009, the Commissioner modified this revenue forecast, and anticipated that the state would receive $30.7 billion in revenue, and that the state would have $4.57 billion less than necessary to meet its obligations in the 2010–2011 biennium. During the 2009 legislative session, spending changes were enacted into law that reduced the state's projected deficit. But, on June 4, 2009, after the legislative session ended, the Commissioner projected in a letter to the Governor that the state would still be short $2.7 billion for the 2010–2011 biennium. Because the Commissioner determined that probable receipts would be less than anticipated and revenues were less than needed to satisfy

the state's obligations for the 2010–2011 biennium, the Commissioner utilized the authority in section 16A.152, subdivision 4, to avoid deficit spending.

This statute provides:

(a) If the commissioner determines that probable receipts for the general fund will be less than anticipated, and that the amount available for the remainder of the biennium will be less than needed, the commissioner shall, with the approval of the governor, and after consulting the Legislative Advisory Commission, reduce the amount in the budget reserve account as needed to balance expenditures with revenue.

Minn.Stat. § 16A.152, subd. 4(a). There were no funds in the budget reserve account that could be used to balance the budget. Accordingly, the Commissioner unallotted under subdivision 4(b) of the statute, which provides:

(b) An additional deficit shall, with the approval of the governor, and after consulting the legislative advisory commission, be made up by reducing unexpended allotments of any prior appropriation or transfer. Notwithstanding any other law to the contrary, the commissioner is empowered to defer or suspend prior statutorily created obligations which would prevent effecting such reductions.

Minn.Stat. § 16A.152, subd. 4(b).

There is no dispute in this case that the Commissioner sought and received the approval of the Governor, as subdivision 4(b) of the statute required, before the unallotments were made. The parties also agree that the Commissioner consulted with the Legislative Advisory Commission before making any unallotments, as the statute also mandates. But the parties dispute whether the Commissioner complied with the statute in two respects. First, respon-

dents contend that the unallotments did not comply with the statute because, they argue, "probable receipts for the general fund" were not "less than anticipated." Minn.Stat. § 16A.152, subd. 4(a). Second, respondents argue that the unallotments violated the statute because the Commissioner did not determine that the "amount available for the remainder of the biennium will be less than needed" when he unallotted.[1] *Id.*

The parties each contend that the plain language of the statute supports their position, and, they argue in the alternative, that if we were to determine that the statute is ambiguous, principles of statutory construction counsel that we construe the statute in their favor. The majority concludes that the parties' different readings of the statute are reasonable and that therefore the statute is ambiguous. The majority uses its determination of ambiguity as an invitation to rewrite the statute to include the condition precedent of a balanced budget. Specifically, the majority divines that what the Legislature meant to say was that once a balanced budget has been enacted into law and a deficit thereafter occurs, the Commissioner may unallot to make up that deficit. The obvious problem with this rewrite is that it is a rewrite. The Legislature chose not to include the condition precedent the majority finds necessary, and we cannot, under the guise of statutory construction, add it. *See* Minn. Stat. § 645.16 (2008) ("When the words of a law in their application to an existing situation are clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit."). Our task instead is to read the words and apply them as the Legislature wrote them. *Phelps v. Commonwealth Land Title Ins. Co.*, 537 N.W.2d 271, 274 (Minn.1995) ("Where the intention of the legislature is clearly manifested by plain unambiguous language ... no construction is necessary or permitted."). I turn now to that task and consider the two specific provisions in the statute at issue.

## A. Were Probable Receipts Less than Anticipated?

Respondents argue, and the district court held, that the Commissioner's unallotments violated the statute because the budget deficit was not "previously unforeseen." Respondents' argument is based on the fact that the budget deficit was known in February when the Commissioner prepared the forecast. Moreover, respondents contend that when the Governor signed appropriation legislation and vetoed revenue legislation, the Governor (and therefore the Commissioner) knew that the state would not have funds sufficient to satisfy the financial obligations in the appropriation legislation. Therefore, respondents argue, the budget deficit was not unanticipated.

Even assuming the factual predicates for respondents' arguments, I would hold that the Commissioner complied with the plain language of the unallotment statute. When we construe statutes, our obligation is to determine whether the statute is plain on its face. *State v. Peck*, 773 N.W.2d 768, 772 (Minn.2009). If so, the role of the judiciary is to apply the language as it is written. *See id.* at 773 ("We have no opportunity to ignore part of the legislature's definition."); *State v. Jesmer*, 293 Minn. 442, 442, 196 N.W.2d 924, 924 (1972)

---

1. Even though the unallotments were made under paragraph (b) of subdivision 4, the parties agree that the threshold determinations set forth in paragraph (a) ("that probable receipts for the general fund will be less than anticipated" and "that the amount available for the remainder of the biennium will be less than needed") operate to constrain the Commissioner's decision-making.

("In construing statutes, we have said that where language is unambiguous, the clearly expressed intent must be given effect and there is no room for construction." (citation omitted) (internal quotation marks omitted)).

The statute requires that the Commissioner determine that "probable receipts . . . will be less than anticipated." Minn. Stat. § 16A.152, subd. 4(a). Plainly, the Commissioner must make this determination before he unallots. But the statute does not provide any other deadline by which the Commissioner is to make this determination. *See id.* The Legislature could have imposed temporal restrictions on the Commissioner's decision-making if that was its intention, but it chose not to do so in this statute. Specifically, the Legislature could have written into the statute the requirement that the Commissioner may unallot only where a budget deficit arises that was not projected in the most recent budget forecast. The Legislature also could have added a provision requiring the Commissioner to make the determination, within the biennium itself, that "probable receipts . . . will be less than anticipated." The Legislature did not do so, and as we have repeatedly recognized, it is not for the judiciary to insert such restrictions. *See e.g., Reiter v. Kiffmeyer,* 721 N.W.2d 908, 911 (Minn.2006)

(expressly declining to read time requirements into a statute because "we will not read into a statute a provision that the legislature has omitted, either purposefully or inadvertently"); *Morrison v. Mendenhall,* 18 Minn. 232 (Gil.212, 218–20) (1872) (declining to interpret a foreclosure statute as containing additional requirements because the Legislature rather than the courts must be the source of any modifications to the statute as written).[2]

There likewise is no requirement in the statute that the Commissioner determine the cause of the budget deficit before he may unallot. Which of the two coordinate branches of government is responsible for the budget shortfall now facing Minnesota is the subject of many pages of debate in this litigation. The judiciary is not the venue to resolve this dispute. *See In re McConaughy,* 106 Minn. 392, 415, 119 N.W. 408, 417 (1909) ("Many questions arise which are clearly political, and not of judicial cognizance."). Moreover, even if the judicial branch were inclined to wade into this dispute, it would be irrelevant in this case because there is nothing in section 16A.152 that limits the Commissioner's authority to unallot depending upon what or who is most responsible for the budget shortfall. The judiciary cannot rewrite the statute to add such restrictions.

**2.** *See also Greene v. Comm'r of Minn. Dep't of Human Servs.,* 755 N.W.2d 713, 722 (Minn. 2008) (noting that it is not the "proper function" of the judiciary to add "a right into the statute"); *Beardsley v. Garcia,* 753 N.W.2d 735, 740 (Minn.2008) (declining to interpret the statute so as to "effectively rewrite" it because that prerogative belongs to the Legislature rather than to the court); *Goldman v. Greenwood,* 748 N.W.2d 279, 285 (Minn.2008) ("The policy-based argument advanced by the dissent regarding when to measure the endangerment to the child is not without merit, but such a determination belongs to the legislature, not to this court."); *State v. Rodriguez,* 754 N.W.2d 672, 684 (Minn.2008) (explaining

that it is the province of the Legislature, not the courts, to expand an accomplice corroboration statutory requirement to jury sentencing trials); *Isles Wellness, Inc. v. Progressive N. Ins. Co.,* 703 N.W.2d 513, 524 (Minn.2005) (explaining that, while some of the original policy considerations supporting the corporate practice of medicine may need reexamination, the Legislature, not the courts, is the appropriate forum to enact such policy change); *Haghighi v. Russian–Am. Broad. Co.,* 577 N.W.2d 927, 930 (Minn.1998) ("If the literal language of this statute yields an unintended result, it is up to the legislature to correct it.").

The unallotment statute simply requires that the Commissioner determine whether "probable receipts for the general fund will be less than anticipated." Minn.Stat. § 16A.152, subd. 4(a). This phrase is not ambiguous in my view, and I would hold that the Commissioner made the necessary determination. Specifically, he concluded, in his June 4, 2009, letter, that "[y]ear to date receipts for FY 2009 are down $70.3 million compared to the February forecast. Nearly all major revenue categories have collected less than anticipated." Respondents make no argument that these determinations were arbitrary or inaccurate in any way. *See In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 277 (Minn.2001) (noting that an "agency's conclusions are not arbitrary and capricious so long as a rational connection between the facts found and the choice made has been articulated" (citation omitted) (internal quotation marks omitted)). Because the Commissioner complied with the plain language of the statute and respondents have not demonstrated that his determination was arbitrary and capricious, I would uphold the Commissioner's determination that "probable receipts for the general fund [were] less than anticipated."

### B. Was the Amount Available for the Remainder of the Biennium Less than Needed?

Respondents argue that the Commissioner's unallotments violated the statute because the unallotments covered the entire biennium. Respondents contend that whether funds are available for the remainder of the biennium cannot be determined until some point after the biennium has begun. Accordingly, respondents argue, unallotments that cover the entire biennium and determinations that are made prior to the start of the biennium violate the plain language of the statute. The Commissioner contends that the "remainder of the biennium," referred to in Minn.Stat. § 16A.152, subd. 4(a), can include the entire biennium. In the alternative, the Commissioner argues that even under respondents' interpretation of "remainder," the unallotment at issue in this case—for the Special Diet Program—was not effective until November 1, 2009, well into the biennium.

The parties' disagreement as to the meaning of "remainder" in the statute appears to be the basis upon which the majority concludes that the statute is ambiguous. In my view, we need not reach the question of whether the word "remainder" can refer to the whole biennium or refers to a period that is less than the whole.

The only question presented in this case is whether the decision to unallot funds from the Special Diet Program complies with the statute. As to the Special Diet Program, the Commissioner determined that "the amount available for the remainder of the biennium will be less than needed"; that is, the amount available, starting November 1, would be less than needed to fund the Special Diet Program for the remainder of the biennium. Further, there is no dispute that the Special Diet Program funds were not unalloted until November 1. The Commissioner's determination that there would be insufficient funds for this program was, indisputably, only with respect to a portion of the biennium and not the entire biennium. We therefore have no occasion in this case to determine whether decisions to unallot that were effective on the first day of the biennium violate the statute. Because the unallotment decision at issue in this case concerned only part of the biennium and the unallotment was not effective until several months into the biennium, the Commissioner's actions complied with the statute no matter how "remainder" is defined.

In sum, I would not reach out to decide more than the narrow question directly presented here. As applied to the unallotment at issue in this case—the unallotment from the Special Diet Program—the statute is not ambiguous, and the Commissioner complied with the plain language the Legislature wrote in the statute. *See* Minn.Stat. § 645.16 (directing that we are to look to see whether "the words of a law *in their application to an existing situation* are clear and free from all ambiguity" (emphasis added)). I would so hold.

## II.

Respondents argue that if the Commissioner's unallotment from the Special Diet Program did not violate the unallotment statute, then the statute is unconstitutional as a violation of the separation of powers doctrine. Because I would conclude that the Commissioner complied with the statute, it is necessary for me to reach the constitutional issue respondents raise.

We are extremely reluctant to declare a statute unconstitutional and will do so "only when absolutely necessary." *In re Haggerty*, 448 N.W.2d 363, 364 (Minn. 1989). Our precedent requires "every presumption" to be "invoked in favor of upholding [a] statute" that is challenged on constitutional grounds. *State v. Schwartz*, 628 N.W.2d 134, 138 (Minn.2001). Because "Minnesota statutes are presumed constitutional," those who challenge the constitutionality of a statute bear a heavy burden in making this challenge. *In re Haggerty*, 448 N.W.2d at 364. In order to succeed, respondents must demonstrate "beyond a reasonable doubt that the statute is unconstitutional." *State v. Merrill*, 450 N.W.2d 318, 321 (Minn.1990). I would hold that respondents have not met their heavy burden to show, beyond a reasonable doubt, that the statute is unconstitutional.

Our constitution divides the "powers of government ... into three distinct departments: legislative, executive and judicial." Minn. Const. art. III, § 1. The constitution also prohibits any "person[ ] belonging to or constituting one of these departments [from] exercis[ing] any of the powers properly belonging to either of the others except in the instances expressly provided in this constitution." *Id.* Respondents argue that the unallotment statute violates the separation of powers because in the statute, the Legislature delegated pure legislative authority to the Commissioner. I disagree.

Where one branch purports to perform completely a function assigned to one of the other branches, such encroachment violates the separation of powers principle. *See Lee v. Delmont*, 228 Minn. 101, 112–13, 36 N.W.2d 530, 538 (1949) (noting that "purely legislative power cannot be delegated" and that "[p]ure legislative power ... is the authority to make a complete law"). We have recognized that such encroachment into the judiciary's sphere of constitutional responsibility is unconstitutional. For example, where the Legislature purports to remove from the judiciary a class of cases that the constitution vests in the judiciary, the Legislature has violated the separation of powers doctrine. *Holmberg v. Holmberg*, 588 N.W.2d 720, 726 (Minn.1999) (holding that "[t]he administrative [child support] process violates separation of powers and is unconstitutional"); *see also Quam v. State*, 391 N.W.2d 803, 809 (Minn.1986) (holding that the Workers' Compensation Court of Appeals "went beyond the quasi-judicial authority delegated to it to determine facts and answer questions of law as they arise under the Workers' Compensation Act and sought to assume the power to determine the validity of a duly promulgated rule of another agency" and the court "thereby

exceeded the scope of adjudicative power the legislature delegated to the agency consistent with the constitutional doctrine of separation of powers").

Our separation of powers analysis therefore requires that we examine the function at issue and determine, as a threshold matter, whether the constitution assigns that function exclusively to one branch in our constitution. *See Irwin v. Surdyk's Liquor*, 599 N.W.2d 132, 141–42 (Minn. 1999) ("Legislation that prohibits this court from deviating from the precise statutory amount of awardable attorney fees impinges on the judiciary's inherent power to oversee attorneys and attorney fees by depriving this court of a final, independent review of attorney fees. This legislative delegation of attorney regulation exclusively to the executive branch of government violates the doctrine of separation of powers."). In the case before us, the function at issue is the spending of state revenue. More specifically, the function is ensuring that the state does not deficit spend because our constitution restricts deficit spending. *See* Minn. Const. art. XI, § 6 ("No certificates [of indebtedness] shall be issued in an amount which ... will exceed the then unexpended balance of all money which will be credited to that fund during the biennium under existing laws.").

The constitution assigns the responsibility to ensure that the state does not deficit spend to both the legislative and executive branches. *See New England Div. of the Am. Cancer Soc'y v. Comm'r of Admin.*, 437 Mass. 172, 769 N.E.2d 1248, 1256 (2002) (recognizing that passing laws authorizing spending is a legislative function and that spending state revenue is an executive function). The constitution assigns this function in part to the Legislature because "[n]o money shall be paid out of the treasury of this state except in pursuance of an appropriation by law." Minn. Const. art. XI, § 1. And the constitution assigns this function in part to the executive branch because the executive branch "shall take care that the laws be faithfully executed." Minn. Const. art. V, § 3. As part of the faithful execution of the law, the executive branch implements the appropriation laws through the spending of state revenue. *See Bowsher v. Synar*, 478 U.S. 714, 732–33, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (describing "authority to determine the budget cuts to be made" to balance the federal budget "as plainly entailing execution of the law in constitutional terms"); *Opinion of the Justices to the Senate*, 375 Mass. 827, 376 N.E.2d 1217, 1222 (1978) (noting that "the activity of spending money is essentially an executive task"). The executive branch must also faithfully execute the constitutional prohibition against deficit spending. *See* Minn. Const. art. XI, § 6. In ensuring that all laws, including appropriation laws and the constitution, are faithfully executed, the executive "is bound to apply his full energy and resources, in the exercise of his best judgment and ability, to ensure that the intended goals of legislation are effectuated." *Opinion of the Justices*, 376 N.E.2d at 1221; *see also Bowsher*, 478 U.S. at 733, 106 S.Ct. 3181 ("Interpreting a law enacted by [the Legislature] to implement the legislative mandate is the very essence of 'execution' of the law.").[3]

---

**3.** In *Bowsher*, Congress passed a law that gave the Comptroller General the authority to mandate which budget cuts the President had to make in the event of a federal budget deficit. 478 U.S. at 717–18, 106 S.Ct. 3181. Because Congress had the authority to remove the Comptroller General, the Supreme Court found the statute unconstitutional. *Id.* at 732–33, 106 S.Ct. 3181. Specifically, the statute was unconstitutional because it vested executive authority in the hands of an office within the legislative branch. *Id.* at 733–34, 106 S.Ct. 3181.

Because the function is one that the constitution commits to both branches, the unallotment statute—which simply acknowledges this joint responsibility—does not delegate pure legislative authority to the executive branch and it does not violate separation of powers. There are many instances in the operation of government, such as the prohibition against deficit spending, where the function at issue requires responsible effort from both of the political branches. Such "cooperative ventures" do not violate the separation of powers. *Mistretta v. United States*, 488 U.S. 361, 371–72, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (holding that congressional creation of United States Sentencing Guidelines Commission did not violate separation of powers).

Precedent from the U.S. Supreme Court and from our court recognizes that within areas of joint responsibility—like that at issue here—the branches may seek assistance from one another without running afoul of the separation of powers. The unallotment statute recognizes that the Legislature needs assistance from the executive branch in determining how best to execute spending priorities when, because of the constitutional restriction on deficit spending, an appropriation law cannot be fully executed. The statute does not give the executive branch the authority to make or unmake the law. Instead, the statute embodies an acknowledgement of the responsibility that the legislative and executive branches share for managing our state's budget, and it provides an opportunity for the political branches to work cooperatively within the confines of our constitution.[4]

As former Chief Justice Taft explained, "[i]n determining what it may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental coordination." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406,

---

4. This principle of cooperation is central to the budget-making and oversight process in Minnesota. Although the Legislature determines appropriations, it is the Commissioner that oversees the allotment process. An "[a]llotment" is "a limit placed by the commissioner on the amount to be spent or encumbered during a period of time pursuant to an appropriation." Minn.Stat. § 16A.011, subd. 3 (2008). The Legislature approves appropriations for agencies, but leaves the determination of the actual spending plans to the agencies. *See* Minn.Stat. § 16A.14, subd. 3 (2008). Agencies submit their spending plans to the Commissioner; those plans must certify that "the amount required for each activity is accurate and is consistent with legislative intent." *Id.* The Commissioner, not the Legislature, then reviews the spending plans to determine whether they are "within the amount and purpose of the appropriation." Minn.Stat. § 16A.14, subd. 4 (2008). The Legislature has very broadly charged the Commissioner with the task of determining whether these spending plans are within the purpose of the appropriation. The Commis-

sioner may even "modify the spending plan and the allotment to conform with the appropriation and the future needs of the agency." *Id.* This authority to review spending plans, approve them, or modify them along with allotments, is different than unallotment, but reflects the Legislature's recognition that the Commissioner's exercise of the spending power requires the executive branch to discern and adhere to the legislative purpose in the appropriations. *See Bowsher*, 478 U.S. at 733, 106 S.Ct. 3181. Stated another way, inherent in the Commissioner's authority to "allot" (i.e., place a limit on the amount of money to be spent pursuant to an appropriation) is the necessity that the Commissioner be guided by his determination of legislative priorities. The Legislature does not give the Commissioner a definitive set of guidelines in discerning legislative purpose and priorities embodied in the appropriations when the Commissioner is making allotments; rather, the Legislature gives the Commissioner broad, flexible authority in making allotments based on his identification of legislative priorities and purpose.

48 S.Ct. 348, 72 L.Ed. 624 (1928) (concluding that a statute that authorized the President to increase tariff rates on foreign products was not a delegation of legislative authority to the President in violation of separation of powers even though the Constitution vested in Congress the power to levy duties). Specifically with regard to the legislative branch seeking assistance from the executive branch, so long as "Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power." *Id.* at 409, 48 S.Ct. 348.

We have likewise recognized that "some interference between the branches does not undermine the separation of powers; rather, it gives vitality to the concept of checks and balances critical to our notion of democracy." *Wulff v. Tax Court of Appeals*, 288 N.W.2d 221, 223 (Minn.1979) (noting that a "strict interpretation of the separation of powers doctrine would make the existence and functioning of . . . agencies nearly impossible"). And we have embraced the "intelligible principle" standard from *Hampton* in our own separation of powers jurisprudence. *See Lee v. Delmont*, 228 Minn. 101, 113 n. 10, 36 N.W.2d 530, 539 n. 10 (1949) (citing *Hampton*, 276 U.S. at 409, 48 S.Ct. 348).

Specifically, we have held that "the legislature may authorize others to do things (insofar as the doing involves powers which are not exclusively legislative) which it might properly, but cannot conveniently or advantageously, do itself." *Id.* at 112–13, 36 N.W.2d at 538. Such legislative authorization does not offend the separation of powers as long as the Legislature provides a sufficient check in the form of a "reasonably clear policy or standard of action which controls and guides the administrative officers in ascertaining the operative facts to which the law applies." *Id.* at 113, 36 N.W.2d at 538. The law must "take[ ] effect upon these facts by virtue of its own terms, and not according to the whim or caprice of the administrative officers." *Id.* If this check exists on the executive branch's exercise of authority, the "discretionary power delegated to the [executive branch] is not legislative," and there is no separation of powers violation. *Id.* at 113, 36 N.W.2d at 538–39. We have also recognized "that what is a sufficiently definite declaration of policy and standard varies in degree according to the complexity of the subject to which the law is applicable." *Anderson v. Comm'r of Highways*, 267 Minn. 308, 309, 315, 126 N.W.2d 778, 779, 782–83 (1964) (holding that a statute that delegated authority to commissioner of highways to suspend driver's license where driver "is an habitual violator" was not an unconstitutional delegation of legislative authority). The unallotment statute satisfies the rule we applied in *Lee* and *Anderson*.

The statute sets forth the "controls" that guide the Commissioner. *Lee*, 228 Minn. at 113, 36 N.W.2d at 538. The Commissioner cannot unallot unless "probable receipts for the general fund will be less than anticipated" and "the amount available for the remainder of the biennium will be less than needed." Minn.Stat. § 16A.152, subd. 4(a). Once these determinations are made, the Commissioner must first exhaust the budget reserve account before invoking the unallotment authority. *Id.; see also* Minn.Stat. § 16A.152, subd. 4(b), (c). All of the determinations necessary to trigger the statute are objectively verifiable and remove the unallotment authority from the mere "whim or caprice" of the Commissioner.

*Lee,* 228 Minn. at 113, 36 N.W.2d at 538.[5]

But these triggers are not the only controls on the Commissioner's discretion. To the contrary, the Legislature has restricted the scope of the Commissioner's unallotment authority in several additional and clear ways. First, the Commissioner may only unallot to the extent necessary to prevent deficit spending. *See* Minn. Stat. § 16A.152, subd. 4(b) ("An additional deficit shall ... be made up by reducing unexpended allotments...."). The unallotment itself does not impact the appropriation legislation; it merely delays incurring the obligation until revenue is in place to pay for it.

Second, before the Commissioner may unallot, the Commissioner must "consult[ ] the legislative advisory commission." *Id.* "Consult" means "to ask the advice or opinion of" and "to deliberate together." *Merriam–Webster's Collegiate Dictionary* 248 (10th ed. 1993). Our precedent requires that "every presumption" be "invoked in favor of upholding the statute," which necessarily means that we must give force to the Commissioner's obligation to seek the advice of and to deliberate with the legislative branch. *See State v. Schwartz,* 628 N.W.2d 134, 138 (Minn.2001). Through the required consultation with the Legislative Advisory Commission, a group that includes the leaders from both houses of the Legislature,[6] the executive branch receives the benefit of guidance as to legislative priorities and concerns. *See R.E. Short Co. v. City of Minneapolis,* 269 N.W.2d 331, 337 (Minn.1978) ("In the absence of evidence to the contrary, public officials, administrative officers, and public authorities, within the limits of the jurisdiction conferred upon them by law, will be presumed to have properly performed their duties in a regular and lawful manner and not to have acted illegally or unlawfully ...." (citation omitted) (internal quotation marks omitted)). By requiring that the Commissioner ask the advice of and deliberate with the Legislative Advisory Commission *before* the Commissioner unallots, the Legislature has provided an important check on the Commissioner's decision-making.

Third, the Legislature has prioritized the areas from which the Commissioner may unallot by specifically exempting several funds from the unallotment authority. *See, e.g.,* Minn.Stat. § 16A.14, subd. 2a(1) (2008) (noting that the allotment system does not apply to appropriations for the judiciary or the Legislature); Minn.Stat. § 16A.14, subd. 2a(2) (2008) (providing exemption for unemployment benefits); Minn.Stat. § 16B.85, subd. 2(e) (2008) (providing that the risk management fund "is exempt from the provisions of section 16A.152, subdivision 4"); Minn.Stat. § 477A.011, subd. 36(y) (2009 Supp.) (providing that "[t]he payment under this paragraph is not subject to ... any future unallotment of the city aid under section 16A.152").

Fourth, of those funds that the Legislature has directed are available for unallotment (in other words, those programs

---

**5.** These triggers also demonstrate that this statute is not in any way similar to the statute at issue in the case the concurrence cites, *State v. Great Northern Railway Co.,* 100 Minn. 445, 479, 111 N.W. 289, 294 (1907) (suggesting that if statute charged commission with "supervis[ion] [of] the issuance of only such stock as is authorized by law," and with "the duty of ascertaining in each case whether the proposed increase is for an authorized purpose and in accordance with the requirements of the law," the statute would have been constitutional).

**6.** *See* Minn.Stat. § 3.30, subd. 2 (2008) (listing members of Legislative Advisory Commission).

the Legislature has not exempted from unallotment), the Legislature has further constrained the executive branch. Specifically, the Legislature requires that the Commissioner "reduce allotments ... by the amount of any saving that can be made over previous spending plans through a reduction in prices or other cause," and directs that the Commissioner "may consider other sources of revenue available to recipients of state appropriations and may apply allotment reductions based on all sources of revenue available." Minn.Stat. § 16A.152, subd. 4(d), (e). Fifth, once an unallotment has been made, the Commissioner must, within 15 days, notify four different committees of the Legislature of the decision. Minn. Stat. § 16A.152, subd. 6 (2008).

Finally, the Legislature, of course, remains free in the next legislative session to undo the unallotments as it has done in the past. *See, e.g.,* Minn.Stat. § 41A.09, subd. 3a(h) (2008) (requiring that the Commissioner "reimburse ethanol producers for any deficiency in payments ... because of unallotment"). The fact that the Legislature retains, and has exercised, the authority to undo the Commissioner's unallotments provides an important check on the Commissioner's exercise of discretion. This check is not unlike the check we have found relevant within our own sphere in the opportunity for our review of decisions from executive branch "courts." *See, e.g., Mack v. City of Minneapolis,* 333 N.W.2d 744, 753 (Minn.1983) (finding that the "power" of the Workers' Compensation Court of Appeals, an executive branch court, "to set attorney fees is constitution-

ally permissible, because these awards are reviewable by this court"). *But cf. Holmberg v. Holmberg,* 588 N.W.2d 720, 725 n. 36 (Minn.1999) ("[T]he availability of judicial review alone will not provide adequate judicial supervision to protect a system against a separation of powers challenge."). If the opportunity for judicial review in our court is a relevant check of executive branch "courts," logic dictates that a similar check in the legislative branch is likewise relevant to a separation of powers challenge to the unallotment statute.

In sum, the unallotment statute provides objectively verifiable triggers for the Commissioner's unallotment authority. It defines the scope of what the Commissioner may unallot—only funds sufficient to resolve the deficit. It prioritizes the funds from which the Commissioner may not unallot, and for those funds available, it provides further guidance as to how the Commissioner is to unallot from those funds. It requires that the Commissioner work with the Legislative Advisory Commission in exercising the unallotment function. Finally, the Legislature retains an important check through its ability to undo the unallotments. Our precedent compels the conclusion that there are sufficient standards in this statute. This is especially true if we recall that every presumption is to be invoked in favor of upholding the constitutionality of a statute. *Schwartz,* 628 N.W.2d at 138.[7]

The issues presented here are only whether the Commissioner complied with the statute, and whether the unallotment statute is constitutional. Because I would

7. My conclusion that the statute is constitutional is in accord with the nearly unanimous result from jurisdictions around the country that have upheld the constitutionality of similar unallotment statutes. *See Univ. of Conn. Chapter AAUP v. Governor,* 200 Conn. 386, 512 A.2d 152, 156–59 (1986); *Legislative Re-*

*search Comm'n v. Brown,* 664 S.W.2d 907, 926–31 (Ky.1984); *New England Div. of the Am. Cancer Soc'y v. Comm'r of Admin.,* 437 Mass. 172, 769 N.E.2d 1248, 1256–58 (2002); *N.D. Council of Sch. Adm'rs v. Sinner,* 458 N.W.2d 280, 285–86 (N.D.1990); *Hunter v. State,* 177 Vt. 339, 865 A.2d 381, 396 (2004).

hold that the Commissioner complied with the plain language of the statute when he unallotted from the Special Diet Program, and that respondents have not met their heavy burden to prove that the unallotment statute is unconstitutional, I would reverse.

ANDERSON, G. BARRY, Justice (dissenting).

I join in the dissent of Justice Gildea.

DIETZEN, Justice (dissenting).

I join in the dissent of Justice Gildea.